The STATE of Texas, Appellant,

v.

Robert D. LEMON, Appellee.

No. 9117.

Court of Civil Appeals of Texas, Amarillo.

July 18, 1980.

Jerry L. Zunker, Gen. Counsel, State Bar of Texas, Austin, Linda Marchesseau, Asst. Gen. Counsel, Austin, for appellant.

Gibson, Ochsner & Adkins, Wayne P. Sturdivant, Amarillo, Lemon, Close, Atkinson, Shearer & McCutcheon, Robert D. Lemon, Perryton, pro se, for appellee.

REYNOLDS, Chief Justice.

The grievance Committee for State Bar District No. 13, acting in the name of the State of Texas, appeals from a judgment, rendered on a jury verdict, decreeing that attorney Robert D. Lemon is not guilty of professional misconduct and dismissing the State's formal complaint lodged against him. The State, in essence, contends that Lemon's professional misconduct was established as a matter of law, and complains that the trial court erred in excluding evidence and in submitting the cause. Concluding that the State has not demonstrated reversible error, we affirm.

The State, acting by the Grievance Committee, instituted its formal complaint of professional misconduct against Robert D. Lemon under and by virtue of the State

Bar Act, Article 320a–1 (Vernon 1973),[1] and the Rules Governing the State Bar of Texas as adopted by the members of the State Bar of Texas and promulgated by the Supreme Court of Texas (Vernon 1973).[2] The State alleged that "o[n] or about Saturday, June 1, 1974, Lemon on his own volition visited the Blaus at their home to discuss the situation." The situation depicted was that Lewis Blau, a cattle buyer, and his wife, Jenny Jo Blau, an assistant cashier of First Bank & Trust Company in Booker, Texas, had perpetrated a "check kiting" scheme on the bank in furtherance of Lewis Blau's cattle operations. Lemon, a licensed attorney officing in Perryton, Texas, was a stockholder of and a lawyer for the bank.

Continuing its allegations, the State alleged in the next sentence that "The Blaus and Lemon then and there entered into an attorney—client relationship." There followed the State's allegations of advice Lemon gave the Blaus and the actions Lemon took on their behalf while fulfilling his role with the bank. This conduct, the State charged, amounted to professional misconduct in that, in brief, Lemon accepted professional employment from the Blaus in conflict with his own interest in the bank and without making full disclosure and obtaining consent of the Blaus and the bank. Alternatively, it was alleged that Lemon, while representing the bank, gave advice to the Blaus, who were not represented by counsel, other than advice to secure counsel, when the Blaus' interests were or had a reasonable possibility of being in conflict with the bank's interests.

The evidence reveals that Jenny Jo Blau is the cousin of Lemon, who had attended the legal services previously required by the Blaus. Lemon's brother, also the cousin of Jenny Jo Blau, is president of the Booker Bank. Jenny Jo Blau was employed by the

bank as a teller in 1970 and became an assistant cashier in February, 1974. From January until May of 1974, she covered checks that Lewis Blau and an associate passed between the Booker bank and a bank in Kansas to conceal cattle and cattle futures losses, which approximated one-half million dollars. When it became evident the scheme would become known, Lewis Blau revealed the scheme to both a director and the president of the Booker bank on 30 May 1974. On the same day, Jenny Jo Blau outlined her involvement to the senior vice-president and trust officer of the bank. On this and the following day, the Blaus made a full and complete disclosure of the illegal operations to the president of the Booker bank.

On the morning of 1 June 1974, the Blaus, totally on their own volition, went to the office of their accountants to trace the kiting operation and establish the loss. For some time thereafter, at least Jenny Jo Blau worked with the accountants to identify and sort the checks involved in the scheme. The same day, Lemon flew with some Booker bank officials to Austin to report the matter to the Banking Commissioner. The next morning, Lemon informed the United States Attorney and, pursuant to the instructions of the Banking Commissioner of Texas, reported the bank fraud to an agent of the Federal Bureau of Investigation on the following Monday.

Prior to the evening of 1 June 1974, Lewis Blau attempted to telephone Lemon to ask him to come to Booker, the town where the Blaus resided. That evening, Lemon and his wife went to the Blaus' home and a discussion ensued. Lewis Blau asked, "What do we do?" Lemon first informed the Blaus, so he and his wife testified, that he could not represent them in the matter,

---

1. All references to articles are to the articles of the Texas Revised Civil Statutes Annotated.

2. Subsequent to the rendition of the trial court's judgment, the Legislature, pursuant to the Texas Sunset Act, Article 5429k (Vernon Supp. 1980), reenacted the State Bar Act in a different form. Article 320a–1 (Vernon Supp. 1980). On the effective date of the reenact-

ment, the Supreme Court of Texas ordered, *inter alia*, that the Rules Governing the State Bar of Texas and the Code of Professional Responsibility which were then in force and not in conflict with the State Bar Act, as amended, shall continue in force. (Vernon Supp. 1980). However, there is no contention that these actions influence the present proceedings.

which was affirmatively acknowledged by the Blaus. Lemon stated that he also informed the Blaus that they should be represented and should have a lawyer, and that he would be representing the bank. It was the Blaus' trial recollection of the discussion that Lemon said he would represent them and if, at a later date, it appeared the Blaus needed him more as a character witness, Lemon would help them get another attorney.

In this connection, subsequent events are illuminating. The witness Schultz, who Lewis Blau identified as a close friend to whom he had never told his bank problems, testified that two days later on 3 June 1974, Lewis Blau said to him, "He [Lemon] has been my attorney for always and that little (expletive deleted) ain't going to represent me in this [his problems at the Booker bank]." The following day, in Lemon's office and in the presence of Powell and Steging, two special agents of the Federal Bureau of Investigation, Jenny Jo Blau freely signed a "waiver of rights" form which, preceded by a statement of her right to a lawyer, has this waiver: "I do not want a lawyer at this time." Following the 4 June 1974 interview with the Blaus, the two agents met with Lemon and his law partner Close. Agent Steging testified that he said to Lemon, "I, personally, don't believe that you can represent the Blaus. I think it's a conflict of interests." According to Steging, Lemon disagreed, but that Close commented to Lemon, "Maybe he is right." Agent Powell generally corroborated Agent Steging's testimony. Lemon denied the quoted conversation; Close said he did not remember any such conversation. In her sworn 16 December 1977 statement about the 1 June 1974 discussion, Jenny Jo Blau records that "he [Lemon] did tell us that if he could, he would like to represent us, you know, if we went to Court." Assistant United States Attorney McRoberts testified to the response Lemon made to his statements in a 26 March 1975 telephone conversation. McRoberts' testimony was: "He [Lemon] told me that he felt there was no conflict. That the Blaus were aware of he [sic] and his family's relationship to the

Bank. That, in addition, there was a family relationship between his family and Mrs. Blau. That if the Judge felt it was necessary that another attorney would be retained to represent the Blaus." Lemon denied any conversation like that with McRoberts. It is undisputed that there was no mention of any attorney's fee for Lemon, no charge was made by Lemon to the Blaus, and they never have been asked to pay, or paid, any money to Lemon in this regard.

Returning to the record of the 1 June 1974 meeting between the Blaus and the Lemons, it shows the discussion continued on other subjects. There is some dispute about the subject matters. Disputed to some extent is whether there was any conversation concerning the Blaus' securing the services of another lawyer and the fee therefor, notification to the Federal Bureau of Investigation, and whether the Blaus should meet with agents of the Bureau. Generally undisputed is that the overall situation, the notification made to the Banking Commissioner, the possibility of indictments of the Blaus and their available pleas thereto, and the course of action open to them were subjects of the discussion. Suffice it to state for the moment that the Blaus testified they acted in reliance upon the advice and expertise Lemon shared with them that night without consulting another attorney until March of 1975, when they were told by Lemon that they were going to be indicted.

Subsequent to the 1 June 1974 discussion with Lemon, the Blaus, or at least Jenny Jo Blau, continued to work with their accountants until all checks involved in the scheme were, so far as she knew, identified. The Blaus' 4 June 1974 meeting with the special agents of the Bureau was arranged by Lemon, but there is discord whether he acted at the request of the Blaus or on his own initiative.

On 11 June 1974, an attorney representing the bonding company which had issued a banker's blanket bond and a fidelity bond to the Booker bank met with the Blaus at the bank. Later in December of 1974 and after settlement of the bond coverage,

Lemon, at the request of the bonding company attorney, was instrumental in getting the Blaus to come to his office to meet with the bonding company attorney. There, they signed a statement prepared by the attorney documenting their June 11 meeting and their culpability in the bank fraud. It was Mrs. Blaus' testimony, which Lemon denied, that she asked Lemon if it was all right to sign the statement and he advised that they should sign.

It is agreed that Lemon and Assistant United States Attorney McRoberts had the 26 March 1975 telephone conversation mentioned earlier. There is disagreement whether one or two telephone conversations occurred, and some disagreement not only about the actual words spoken, but about the nuances attributable to the words employed and their tenor. In any event and as a result of the conversation, Lemon contacted the Blaus, advising them they would be indicted and what the charges were. He also said they could plead guilty and the United States attorney would not opposed a request for a probated or suspended sentence, but he would not agree to it. Lemon advised that they would need a lawyer. Lewis Blau asked if Lemon would recommend and get an attorney for them. Lemon arranged for them to meet with an attorney in Amarillo, who referred them to a Lubbock attorney.

Thereafter, the Blaus were indicted. Represented by the Lubbock attorney, they each pleaded guilty to one count of a ten-count indictment. Lemon testified as a character witness. Lewis Blau was sentenced to thirty months confinement, serving twenty-one months and two weeks, and Jenny Jo Blau was placed on probation.

After the evidence, summarized above, was adduced before the jury, the court submitted the cause on five special issues calling for "yes" or "no" answers. The jury was instructed to

Answer all Special Issues "Yes" or "No" unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No."

Two special instructions were respectively directed to the first and second issues. The jury answered the first and last issues, the only issues not conditionally submitted. These issues, the special instruction preceding and directed to the first issue, and the jury's answers are recorded thusly:

In answering Special Issue No 1, you are instructed that the attorney-client relationship is created as a result of an offer or request for services made by the client and an acceptance or assent thereto by the attorney. The relationship is not dependent upon payment of a fee nor is a formal contract necessary. The relationship is contractural [sic] in nature, that the contract may be implied from the conduct of the parties. However, there must be a meeting of the minds between the attorney and client as to the creation of the attorney-client relationship. Whether there was a meeting of the minds in this case sufficient to establish the attorney-client relationship is determined from the objective standards of what was said and done, not from the subjective intent of the persons involved.

The relationship commences from the date of employment of an attorney, that is, from the date when the contract was created. The plaintiff in this case has the burden of proving by a preponderance of the evidence that an attorney-client relationship existed between Mr. and Mrs. Lewis Blau and Robert D. Lemon.

\*　　\*　　\*　　\*　　\*　　\*

### SPECIAL ISSUE NO. 1

On June 1, 1974, was an attorney-client relationship created between Mr. and Mrs. Lewis Blau and Robert D. Lemon?
ANSWER "YES" OR "NO."
ANSWER: No

\*　　\*　　\*　　\*　　\*　　\*

### SPECIAL ISSUE NO. 5

While Robert D. Lemon was representing the First Bank and Trust Company of Booker did he give legal advice to Mr. or Mrs. Lewis Blau, other than the advice to

secure counsel, at a time when they were not represented by counsel and when their interests had a reasonable possibility of being in conflict with the interests of the Bank?

ANSWER "YES" OR "NO."

ANSWER: <u>No</u>

The State made, and the court overruled, a motion for judgment non obstante veredicto and, alternatively, to disregard the jury's "findings" to special issues numbers 1 and 5. Judgment was rendered on the verdict, decreeing that Robert D. Lemon is guilty of no professional misconduct and dismissing the State's complaint. The State appeals, presenting ten points of error which will be addressed topically rather than seriatim.

In two of its points, the State assigns error to the court's overruling its motion for judgment n. o. v. "because there was no competent evidence to support the jury's finding in Special Issue No. 1" or "in Special Issue No. 5." The points miss the mark. The jury's "no" answers are not affirmative findings of the nonexistence of the facts inquired about; instead, the "no" answers, when properly interpreted in the light of the court's instructions, are nothing more than failures or refusals by the jury to find from a preponderance of the evidence the vital facts which the State had the burden to affirmatively establish to prevail. The negative answers simply mean that the State failed to discharge its burden of proof. *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966). Consequently, the points *per se* are unavailing, for a jury's failure to find a fact vital to recovery need not be supported by evidence. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973).

■ Nevertheless, as *Fambrough v. Wagley*, 140 Tex. 577, 169 S.W.2d 478 (1943), and its progeny teach, we have looked to the statements and arguments under the points to reach and pass on the actual merits of the points. There, we find that the State's real contention is that it established the facts inquired about as a matter of law. The only question presented by the points,

then, is whether the State discharged its burden to show as a matter of law the facts the jury failed or refused to find. *Ashley v. Usher*, 384 S.W.2d 696, 697–98 (Tex. 1964). In this regard, a judgment non obstante veredicto would be warranted only if the evidence so concludes the issues in favor of the State that no other verdict should be rendered. See *Air Conditioning v. Harrison-Wilson-Pearson*, 151 Tex. 635, 253 S.W.2d 422, 425 (1952).

■ Initially, the State, prefacing its presentation with principles pronounced in other jurisdictions, argues that the evidence established, as a matter of law, the attorney-client relationship inquired about in the first issue under the controlling law declared in *Prigmore v. Hardware Mut. Ins. Co. of Minnesota*, 225 S.W.2d 897, 899 (Tex. Civ.App.—Amarillo 1949, no writ), in this language:

> It is our opinion that the relation of attorney and client does not depend upon the payment of a fee. Such may exist as a result of rendering services gratuitously. A contract of employment may exist merely as a result of an offer or request made by the client and an acceptance or assent thereto by the attorney. The contract of employment may be implied by the conduct of the two parties.

Accepting the declaration, which is echoed in the special instruction for the first issue, as the controlling law, its application to the testimonial facts may not be accepted as conclusively establishing an attorney-client relationship. This is for the reason that the evidence excerpted in the forepart of this opinion manifests conflicts and inconsistencies on the issue of an attorney-client relationship. The evidence is particularly conflicting and without consistency with respect to whether there was an actual acceptance or assent by Lemon and, if not, whether the conduct of the parties implied such relationship. The conflicting and inconsistent evidence did no more than raise the issue of an attorney-client relationship and, thus, the question was one for the determination of the jury. *Home Inv. Co. v. Strange*, 109 Tex. 342, 195 S.W. 849, 852

(1917), *reformed on other grounds*, 109 Tex. 350, 204 S.W. 314; 109 Tex. 351, 207 S.W. 307 (1918).

Next, the State, assuming but not admitting that Lemon acted solely as attorney for the bank, urges that as a matter of law the evidence proved the fact inquired about in the fifth special issue, thereby establishing Lemon's violation of Disciplinary Rule 7–104(A)(2). That rule, entitled "Communicating With One of Adverse Interest," states, in this respect, that:

> (A) During the course of his representation of a client a lawyer shall not:
>
> \* \* \* \* \* \*
>
> (2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interest of his client.

(Vernon 1973). The State views the testimony of Lemon's discussing with the Blaus the possibility of indictments, the forum of trial, the pleas, a similar case, the best way to keep the "thing" quiet, and the "best deal" he could make with the United States Attorney as indisputably establishing the violation. We are not persuaded to that view.

The State argues from the viewpoint that the mere giving of advice, with testimony of reliance, establishes the violation; but, the disciplinary rule is not so restrictive. It has the added requirement that "the interests of such person [the person to whom the advice is given] are or have a reasonable possibility of being in conflict with the interest of his [the attorney's] client." Yet, the State has not undertaken to recite from the record the evidence of prohibited conflict of interests. On the other hand, some of the evidence selected by the State as constituting the giving of advice is contradicted, and there is evidence which, if believed, tends to negate a conflict of interest. The bank officials were interested in recouping the bank's loss from the bonding company. There is no evidence the officials were, or Lemon was, interested in a prosecution of the Blaus; in reality, the evidence

suggests otherwise. The Blaus, on their own initiative, made a full and complete disclosure of the illegal operations to bank officials, which the State stipulated, and began tracing the kiting operation with their own accountants to establish the bank's loss before they ever talked with Lemon. There is no contradiction of the bonding company attorney's testimony that neither the information given him by the Blaus nor their indictment and conviction was necessary for payment of the bank's loss. No effort was undertaken to hold the Blaus civilly liable for the bank's loss, nor have they been asked to pay any part of it. So, the state of the evidence did no more than raise the ultimate question, making the determination an issue for the jury. *Air Conditioning v. Harrison-Wilson-Pearson, supra*, 253 S.W.2d at 425.

In passing on the merits of the foregoing points, we necessarily reviewed all of the evidence in the 696-page statement of facts and attached exhibits, a summary of which previously has been stated. Further, we have considered and weighed all of the evidence by the guidelines announced in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951), to determine whether, as the State contends, the jury's answers to special issues numbers 1 and 5 are against the great weight and preponderance of the evidence. Having done so, we cannot say that either of the jury's answers is so against the great weight and preponderance of the evidence as to be manifestly unjust.

The State charges the trial court with multiple errors arising from the submission of special issue No. 1 because it contained the phrase "On June 1, 1974." Objecting to the issue, the State first requested that the issue be submitted without a date and then requested, by way of modification, that the phrase "From June 1, 1974 to March 30, 1975," be substituted. We perceive no error in the submission.

The State went to trial on pleadings specifically alleging that

> *On or about Saturday, June 1, 1974,* Lemon on his own volition visited the Blaus at their home to discuss the situation; his

advice and assistance, as an attorney, was [*sic*] sought and received by the Blaus. Lemon had advised the Blaus before in his capacity as an attorney and had previously performed legal services for them. *The Blaus and Lemon then and there entered into an attorney-client relationship* (emphasis supplied).

There is no alternative allegation that an attorney-client relationship ·was entered into or created at any other time. After the evidence was adduced and the court presented its jury charge for inspection and objections, the State made no move to amend its pleadings.

■ The office of the State's pleadings was to define the issues to be tried. By specifically delineating the issue of an attorney-client relationship on 1 June 1974, the State furnished the blueprint for the charge. *See Scott v. Atchison, T. & S. F. R. Co.,* 572 S.W.2d 273, 277 (Tex. 1978). The trial court was required to submit to the jury the controlling issue as it was raised by the written pleadings and the evidence. Tex.R.Civ.P. 277. And the State, having pleaded the specific issue on which evidence was introduced, is in no position to complain of its submission. *Mooney v. Depuy,* 256 S.W. 297, 299 (Tex.Civ.App.—San Antonio 1923, no writ).

Notwithstanding, the State argues that the effect of the issue was to require it to prove an express contract rather than a contract implied in fact. To the contrary, the court explicitly instructed the jury that the contractual relationship may be implied from the conduct of the parties. Interestingly and in contrast to its appellate stance, the State, while making its objections to the charge, acknowledged the court's instruction.

■ Additionally, the State proposes that the inclusion of "June 1, 1974" in the special issue constituted an improper comment on the weight of the evidence. We do not entertain the proposal. To preserve the matter for appellate review, the State was obligated to distinctly specify that objection in the trial court. Tex.R.Civ.P. 274. An objection to the issue for this reason is not

shown in the record at the place cited in the State's brief, and we have not found the objection voiced elsewhere in the record. The State has, therefore, waived any complaint on this ground. *Davis v. Campbell,* 572 S.W.2d 660, 663 (Tex. 1978).

And finally in regard to Special Issue No. 1, the State asks us to find that the cause was submitted under an erroneous theory and to remand the cause for retrial. Special Issue No. 1 submitted the theory pleaded by the State, and a correct judgment was rendered on the verdict. It is axiomatic that a court cannot reverse a correct judgment in order to afford the losing party another trial. *City of Houston v. Blackbird,* 394 S.W.2d 159, 165 (Tex. 1965).

The trial court excluded portions of the testimony offered through the witnesses McRoberts, Powell, Steging and Jenny Jo Blau. The State has asserted that each exclusion is reversible error.

The State offered, as a part of the telephone conversation between McRoberts and Lemon, McRoberts' report to Lemon of his conversation with a Federal judge. The report was that McRoberts had informed the judge that Lemon, who represented the bank, was representing the Blaus, who desired to plead guilty, and that the judge said under no circumstances would he accept the plea because of the appearance of conflict and instructed McRoberts to tell Lemon the Blaus would need to retain other counsel. Lemon objected that the testimony was hearsay. The State, unable to prevail over the hearsay objection, subsequently offered the testimony not to prove the truth of the statement McRoberts made to Lemon, but to prove that McRoberts made it and the effect it had on the mind of Lemon. The court declined the offer, remarking that even if the statement was admissible for that purpose, it would be impossible to instruct against the prejudicial ultimate conclusion the statement would carry to the jury, thereby denying a fair trial.

■ Generally, evidence which is admissible for one purpose, but not competent upon

the main issue, should be admitted under instructions confining its consideration to its admissive purpose so as to prevent the prejudicial effect of considering it for another purpose. *In re Guardianship of Dahl*, 590 S.W.2d 191, 195–96 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.). However, if the tendered evidence is circumstantial, it may be excluded if the danger of creating undue prejudice in the minds of the jurors outweighs the probative value of the proffered evidence. In deciding the balance of such intangibles, the trial judge is accorded wide discretion. 2 R. Ray, Texas Law of Evidence § 1481 (Texas Practice 3d ed. 1980).

██ Here, the State had shown by McRoberts' testimony the response Lemon made to his statement and, by other testimony, the actions Lemon took following the telephone conversation. The excluded fact stated by McRoberts would be circumstantial evidence because it is based upon inferences that Lemon was representing the Blaus rather than upon a direct assertion of the truth of the fact. *Id.* Yet, the truth of the fact stated was exactly what the State was trying to establish. The trial court recognized and expressed the difficulty the jury would encounter in separating the proper use of the evidence from its improper use to prove, by the statement itself, the facts contained in the statement. The court further expressed the opinion that it would be impossible to instruct the jury so that improper consideration would not be given the statement. It is accepted that in some cases even court instructions cannot be said to prevent the harm resulting from improper consideration of the evidence. *Burgess v. Sylvester*, 177 S.W.2d 271, 277–78 (Tex.Civ.App.—Amarillo), aff'd, 143 Tex. 25, 182 S.W.2d 358 (1944). We, like the trial court, consider this to be one of those cases. Accordingly, we discern no abuse of discretion in the court's exclusion of the statement.

██ Upon objection, the court declined to permit Agents Powell and Steging to testify that one of the Blaus mentioned in the 4 June 1974, interview that they were represented by Lemon. The State then offered the testimony to show the state of mind of the witnesses when they questioned Lemon about a conflict of interest. The court refused the offer on that basis, declaring that the state of mind of the two witnesses was not material to any issue in the lawsuit. We agree. It is, of course, a fundamental rule of long standing that to be admissible, evidence must be pertinent to the issues made by the pleadings. *Loftus v. Maxey*, 73 Tex. 242, 11 S.W. 272, 273 (1889).

██ The court also refused to permit Jenny Jo Blau to answer that Lemon represented her as her attorney for the reason that it was a conclusion and opinion going to the ultimate question the jury must decide. The court ruled correctly. A witness must state facts, not conclusions or opinions; it is the province of the jury to draw the proper deductions from the facts. Hence, a witness' conclusions and opinions of the ultimate fact to be decided by the jury, when not offered for impeachment, are inadmissible in a civil case. *Isaacs v. Plains Transport Company*, 367 S.W.2d 152, 153 (Tex. 1963). The principle is applicable to the ultimate question of a contractual relationship. *Casualty Underwriters v. Rhone*, 134 Tex. 50, 132 S.W.2d 97, 99 (1939).

The State has not demonstrated reversible error by any of its ten points of error. Each point is overruled.

The judgment of the trial court is affirmed.

COUNTISS, J., not participating.