In re LEGAL ECONOMETRICS,
INC., Debtor.

LEGAL ECONOMETRICS, INC. and
Malcolm M. Kelso, Plaintiffs,

v.

CHAMA LAND & CATTLE COMPANY,
INC., et al., Defendants.

In re Grady H. VAUGHN, III, Debtor.

REGENCY SAVINGS BANK,
F.S.B., Plaintiff,

v.

Grady H. VAUGHN, III,
et al., Defendants.

Bankruptcy Nos. 393–35603–HCA–
11, 393–36940–HCA–11.
Adv. Nos. 393–3585, 393–
3412 and 394–3007.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

July 26, 1994.

Stephen Sakonchick, II, Austin, TX, for Regency Sav. Bank, F.S.B.

Robert Cook, Cook, Meda & Lane, Tishman Biltmore Office Park, Phoenix, AZ, for Grady H. Vaughn.

Stephen F. Malouf, Law Offices of Stephen F. Malouf, P.C., Dallas, TX, Steven D. Cundra, Thompson, Hine & Flory, Washington,

DC, for Malcolm M. Kelso and Legal Econo-metrics, Inc.

Bruce W. Bowman, Jr., Vial, Hamilton, Koch & Knox, Dallas, TX, for Gary Vaughn.

Robert S. Harrell, Karl G. Dial, Fulbright & Jaworski L.L.P., Houston, TX, for Akin, Gump, Strauss, Hauer & Feld, L.L.P.

## REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL OF CLAIMS OF REGENCY SAVINGS BANK, F.S.B.

HAROLD C. ABRAMSON, Bankruptcy Judge.

### BACKGROUND

The claims of Regency Savings Bank, F.S.B. ("Regency") that are the subject of these Findings of Fact and Conclusions of Law represent one relatively discrete phase of an epic mass of interrelated litigation, which includes at least 15 other adversary proceedings pending in this Court in connection with eight Chapter 11 bankruptcy cases. The Court feels obliged to set forth, for the benefit of any reviewing court, a very brief, broad overview of the facts relevant to this portion of the litigation.

Grady H. Vaughn, III, is the son of a wealthy businessman and is himself a long-time Dallas businessman. At one time Grady and his adopted brother Gary held a substantial inherited fortune. That fortune consisted of, *inter alia*, oil and gas holdings and a huge game ranch and hunting lodge in Chama, New Mexico. Grady, as one of the trustees of Gary's support trust, controlled Gary's share of the inherited assets as well as his own share.

At all times relevant to the litigation, Grady owed several million dollars to NCNB Texas National Bank ("NCNB") or NCNB's successors. The NCNB debt was secured by essentially all of Grady's property, including Grady's ⅔ share of the outstanding stock of Chama Land & Cattle Company, Inc. ("Chama"), which owned the game ranch.[1]

In early 1989, federal and state authorities began an investigation of allegedly illegal wildlife trapping and other activities at the Chama ranch. Grady, looking for a way out of the Chama enforcement action as well as his personal financial problems, decided to enlist the aid of Legal Econometrics, Inc. ("LEI") and its principal Malcolm Kelso, a self-styled "crisis manager" and litigation consultant for troubled businesses. Kelso, LEI, Grady Vaughn, LEI's attorneys Akin, Gump, Strauss, Hauer & Feld, L.L.P. ("Akin Grump"), and others constructed a series of corporate transactions (the "1990 Transactions") that resulted in the installation of Kelso at the helm of the Chama business operation and the effective transfer of most of Chama's assets to separate Vaughn-related entities.[2] It is alleged that the 1990

---

1. Chama's assets consisted of 32,000 acres of land in Rio Arriba County, New Mexico; various improvements, including an airstrip, perimeter fencing, a luxury lodge building with room for 22 guests, and several other buildings; various wild-life, including a large elk herd; and two 3,200–acre Class A-licensed game parks. (A New Mexico Class A game permit allows the permit holder to manage, harvest, and sell wildlife within the park in any manner he sees fit.)

 One appraisal commissioned by Regency has indicated a market value of slightly over $15 million for Chama's assets as of January 1990. The Court, however, has not conducted a valuation hearing as of this date.

2. The 1990 Transactions may be very briefly listed as follows (see note 1, *supra*, for a brief description of Chama's assets as they existed before the 1990 Transactions):

 *100–year lease of ranch property:* Chama leased the ranch property, with the exception of the

two licensed game parks, to a newly formed Vaughn-related entity, Lodge at Chama, Inc. The initial lease term was 50 years, with a 50–year option to renew.

*100–year lease of game parks:* Chama leased the two licensed game parks to a newly formed Vaughn-related entity, American Elk Conservatory, Inc. The initial lease term was 50 years, with a 50–year option to renew. American Elk Conservatory, Inc., also received the two Class A New Mexico game permits.

*Sale of elk:* Chama sold all of the elk on the ranch and in the game parks to American Elk Conservatory, Inc.

*Issuance of warrants:* Chama issued warrants for 35,028 shares of stock in Chama (29.2% of Chama's total issued and outstanding stock) to Antigone Corporation, a Vaughn-related entity. The warrants could be triggered by any of several events, including, *inter alia*, Chama's conviction of a felony, Vaughn's loss of a majority bloc of Chama stock, or Chama's liquidation.

Transactions greatly diminished the value of Chama's stock. It is also alleged that Grady siphoned substantial liquid assets from Gary's support trust, used those assets to fund litigation and pay LEI, and replaced the assets with less valuable, illiquid ownership positions in various closely held corporations. This treatment of Gary's trust assets led to the 1991 filing of *Gary W. Vaughn, et al. v. Grady H. Vaughn, III, et al. v. Akin, Gump, Hauer & Feld* in Dallas County Civil District Court—the first spark in this conflagration of lawsuits.

Meanwhile, in November 1991, NCNB transferred all of its interest in Grady's note and collateral to the FDIC pursuant to the terms of a 1988 "Assistance Agreement" between NCNB and the FDIC. The FDIC, in turn, sold all of its interest in the note and collateral to Regency in July 1992.

Grady Vaughn, LEI, and Kelso filed their respective Chapter 11 bankruptcy cases during June and October 1993 in three separate districts. (LEI filed its petition on June 10; Grady Vaughn on June 15; and Kelso on October 11, 1993.) All three cases are now pending before this Court. Several months later, five more Chapter 11 cases were filed in the District of New Mexico on behalf of five corporations involved in the 1990 Transactions: Chama, Antigone Corporation, American Elk Conservatory, Inc., American Elk Conservatory Holdings, Inc., and Lodge at Chama, Inc. (collectively, "Five New Mexico Corporations"). These cases have likewise been transferred to, and are now pending before, this Court. Various state-court lawsuits were removed to this Court as adversary proceedings in connection with the bankruptcy cases; several additional adversary complaints, including Regency's Adversary Proceeding No. 394–3007, were subsequently filed in this Court.

Chapter 11 trustees have been appointed in the bankruptcy cases of the Five New Mexico Corporations. Grady Vaughn, LEI, and Kelso continue to act as debtors-in-possession in their respective bankruptcy cases.

Regency has obtained an order modifying the automatic stay in Grady Vaughn's bankruptcy case and foreclosed on Grady's stock in Chama Land & Cattle Company, Inc.

### THE "MASTER ADVERSARY": ADVERSARY PROCEEDING NO. 393–3585

LEI and Kelso filed Adversary Proceeding No. 393–3585 as a "Master Adversary," which LEI's counsel has described to the Court as LEI's attempt to bring all parties and claims together into one "umbrella" lawsuit. The Master Adversary has been administratively consolidated with several other lawsuits removed from state courts.

Trial in the Master Adversary began at the end of March 1994 but ended after only two days of testimony about the 1990 Transactions. At that point several of the parties, including Gary Vaughn, Grady Vaughn, LEI, Kelso, Akin Gump, and the Five New Mexico Corporations, announced to the Court their intention to settle their differences. Because Regency was not part of this semi-global settlement, the Court announced that Regency's claims would be "carved out" and tried at a later date. The Court subsequently entered a written order providing that "all evidence heard to date in [Adversary No. 393–3585 and Adversary No. 394–3007] will be preserved and channeled for trial of Regency's claims in the nature of § 523 actions, which shall be tried as core matters together with Regency's interwoven claims against other parties remaining in Adversary Proceeding No. 394–3007."

### THE REGENCY LAWSUIT: ADVERSARY PROCEEDING NO. 394–3007

In Adversary Proceeding No. 394–3007, filed January 6, 1994, Regency asserts the following causes of action against the following defendants:

Fraudulent transfer against Grady Vaughn, three of the Five New Mexico Corporations, and Kelso;

Civil conspiracy to defraud against, *inter alia,* LEI, Kelso, Grady Vaughn, and Akin Gump; and

Fraud and breach of contract against Grady Vaughn.

All of these transactions had been completed by the end of March 1990.

In addition to monetary damages, Regency seeks rescission of the 1990 Transactions, alleging that they amounted to fraudulent conveyances. Regency also requests a declaratory judgment that the 1990 Transactions were void *ab initio.*

In support of its claims, Regency argues that Grady Vaughn committed fraud by failing to disclose information that he had a duty to disclose to NCNB and its successors in interest—*i.e.,* that the 1990 Transactions violated loan covenants between Grady Vaughn and NCNB by taking assets out of Chama and decreasing the value of the Chama stock held as collateral by the bank. In ¶ 4(kk), the Loan Agreement between Grady Vaughn and NCNB specifically forbade Vaughn from approving without the bank's prior written consent "the sale, exchange or other disposition of any material asset of Chama." Regency, as NCNB's successor in interest, seeks to recover the value of the Chama stock as it would have been if the 1990 Transactions had never taken place.

On April 29, 1994, the Court entered its Preliminary Conclusions of Law Regarding Claims of Regency Savings Bank, F.S.B. The Court therein concluded, *inter alia:*

(1) That all claims raised by Regency in Adversary Proceeding No. 394–3007 against Chapter 11 debtors are core proceedings within the meaning of 28 U.S.C. § 157(b)(2);[3]

(2) That Regency's claims regarding fraudulent transfers of the assets of Chama and the rest of the Five New Mexico Corporations could be asserted only by the Chapter 11 trustees of those estates, that Regency has no standing to assert such claims, and that Regency's fraudulent transfer claims should be dismissed; and

(3) That Regency's other claims against Grady Vaughn, Kelso, and LEI[4] are in substance actions under 11 U.S.C. § 523, challenging the dischargeability of debts allegedly owed by those debtors to Regency.

The Court thus fashioned a framework to allow a fair trial of Regency's allegations against debtors LEI, Kelso, and Grady Vaughn and construed Regency's complaint "so as to do substantial justice" as Federal Rule of Bankruptcy Procedure 7008 and Federal Rule of Civil Procedure 8(f) require this Court to do. Regency's complaint as filed might otherwise violate the automatic stay and would result, at most, in the Court's estimation of Regency's allowable claims.

Because the claims against the various debtors are core proceedings, the Court has jurisdiction over them under 28 U.S.C. § 1334. Akin Gump, as a nondebtor defendant, has consented to this Court's jurisdiction over, and this Court's entry of final orders regarding, Regency's claims against Akin Gump. Several other defendants did not participate in the trial, which began May 18, 1994 and concluded two days later.[5]

---

3. The Court's rationale for this conclusion is that all of the events complained of by Regency occurred before the various debtors filed their bankruptcy petitions and are, therefore, simply prepetition claims against the assets of the various bankruptcy estates.

4. The Court's findings were in error to the extent they implied that Regency's claims against LEI, a corporate Chapter 11 debtor, could be nondischargeable under § 523. *See* 11 U.S.C. § 1141(d)(2) ("The confirmation of a plan does not discharge an *individual* debtor from any debt excepted from discharge under section 523 of this title.") (emphasis added).

5. The Court ended the trial over Regency's protest. The Court had instructed Regency's counsel to present to the Court his best evidence of his tort and fraud claims against the various defendants. After Regency's counsel did so, the Court found that (1) Regency had been fully heard with respect to those issues and (2) in light of Regency's having put forth its best attempt at proving its claims, Regency could not possibly satisfy its burden of proof. *See infra* (Regency could show no facts to prove that Grady Vaughn defrauded the bank; in absence of any act of fraud by Grady Vaughn, and in light of applicable statutes of limitations, Regency could not prove other claims pled in complaint).

Regency's counsel requested a continuation of the trial on the ground that Regency had not had time to put forward all of its evidence. The Court denied that request. *See* FED.R.BANKR.P. 7052; FED.R.CIV.P. 52(c) ("If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue").

## Mixed Findings of Fact and Conclusions of Law

The Court adopts the parties' written stipulation of facts, a copy of which is attached hereto as Exhibit A.

The Court admitted as evidence at trial the basic transactional documents as to the notes and security agreements evidencing the loan agreement (the "Loan Agreement") between NCNB and Grady Vaughn, as well as various memoranda, notes, and correspondence offered by Grady Vaughn and by Regency. The most relevant and vital of these documents are (1) letters from William Drozd, an officer of various Vaughn-related entities, to NCNB with regard to compliance by Grady Vaughn with the Loan Agreement, (2) certain news articles, and (3) written notes as to a meeting at NCNB on June 5, 1990.

### The fraud and breach of contract claims against Grady Vaughn

 *Fraud claim.*—Under Texas law, the elements of a fraud cause of action are:

(1) A material representation was made;

(2) The representation was false;

(3) The speaker knew the representation was false when he made it;

(4) The representation was made with the expectation that it would be relied upon by the other party;

(5) The other party acted in reasonable reliance on the representation; and

(6) The other party suffered injury.

*Jackson v. Speer*, 974 F.2d 676, 679 (5th Cir.1992), citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983). As explained *supra*, Regency argues that Grady Vaughn committed fraud by failing to disclose information that he had a duty to disclose to NCNB and its successors in interest, specifically that the 1990 Transactions violated the Loan Agreement between Grady and NCNB by taking assets out of Chama and thus decreasing the value of the Chama stock held as collateral by the bank. The Loan Agreement specifically forbade Vaughn from approving, without NCNB's prior written consent, "the sale, exchange or other disposition of any material asset of Chama. . . ." Loan Agreement ¶ 4(kk).

The evidence shows that Grady Vaughn or his agents promptly notified NCNB as early as May or June of 1990 that he was not in compliance with the Loan Agreement. At that time, NCNB, acting through AMRESCO, had known for several months that Chama was the target of an investigation and a potential seizure by state and federal wildlife authorities. In late May of 1990, Grady Vaughn or his agents sent a routine compliance statement to NCNB stating that Grady Vaughn was not in compliance with ¶ 4(kk) of the Loan Agreement. One of NCNB's loan officers at that time, Mr. Baldwin, testified that the noncompliance notices in that statement and several others were overlooked for several months. Mr. Baldwin could not explain why the notices were overlooked.

On June 4, 1990, Steve Hamilton of the U.S. Fish and Wildlife Department called Jimmy Davis, another NCNB loan officer, and told Davis that Chama had undertaken various transactions or conveyances—the 1990 Transactions—that the Fish and Wildlife Department was planning to challenge. The phone call from Hamilton precipitated a June 5 meeting between NCNB's loan officers and Kelso, Vaughn, and John Falconer, an attorney representing Grady Vaughn. Mr. Hamilton had requested more information about Vaughn from NCNB, but NCNB could not turn over that information without Vaughn's consent. The June 5 meeting was lengthy and included substantial details about the New Mexico litigation. However, the transfers Hamilton had mentioned previously were not discussed or inquired about by NCNB's agents.

Grady Vaughn's statements to NCNB were sufficient to put NCNB on at least inquiry notice about the 1990 Transactions. There is no evidence that Grady Vaughn affirmatively concealed any information or that he failed to disclose information about the 1990 Transactions that he had a duty to disclose. On the contrary, Grady Vaughn's letters to the bank disclosed noncompliance with the Loan Agreement. Even if Grady Vaughn had failed to disclose noncompliance, NCNB received sufficient information from other sources, including, at least, various newspaper clippings in evidence and the in-

formation from Mr. Hamilton, to cast doubt on the question of whether any reliance on such nondisclosure would have been the sort of *reasonable* reliance required to sustain a fraud claim. In other words, the bank, through its officers, ignored what was going on around it.

Because Grady Vaughn made no material representation to the bank that was false regarding the 1990 Transactions or their effect on the value of the Chama stock, Grady Vaughn could not have defrauded the bank. Even if he had, the bank could not have reasonably relied on such a representation because of its longstanding knowledge of Chama's troubles and the fact that the 1990 Transactions had occurred.

Regency's best witnesses and evidence indicate that (1) Grady Vaughn or his agents promptly notified the bank of Grady Vaughn's noncompliance with ¶ 4(kk) and (2) the bank's independent knowledge of facts forecloses any finding of reasonable reliance by the bank on any representation it may have received from any party to this action to the effect that Grady Vaughn *was* complying with the loan documents. The Court therefore finds that there are no further facts Regency could possibly present to the Court that could sustain Regency's burden of proving its fraud claim.

■ *Breach of contract claim.*—The Court further finds that Grady breached his contractual loan covenants with Regency by allowing the Chama assets to be transferred without Regency's prior written consent. However, Regency has not yet had an opportunity to present evidence on the question of Regency's *damages* for its breach of contract claim, which the Court finds would be the difference between the value of the Grady's Chama stock *before* the 1990 Transactions and the value of the stock *after* those transactions. This amount will be a dischargeable claim against Grady's bankruptcy estate.

### The § 523 actions against the Chapter 11 debtors and the tort claims against Akin Gump

In response to the Court's pretrial rulings, Regency announced its intention to focus its dischargeability claims against debtors LEI, Kelso, and Grady Vaughn on 11 U.S.C. § 523(a)(6). Section 523(a)(6) excepts from discharge "any debt for willful and malicious injury by the debtor to another entity or to the property of another entity."

Section 523(a)(2) also might be analogous to some of the claims pled in Regency's complaint. That subsection excepts from discharge "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud...."

Regency must prove its case under § 523 by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991).

***Claims against Akin Gump and debtors other than Grady Vaughn.***—Regency has no contractual relationships with Akin Gump or with debtors Kelso, LEI, or the Five New Mexico Corporations. Therefore, any claims of Regency against these defendants arise from tort causes of action.

Any allowable claim against a debtor's estate must be a claim that is "enforceable against the debtor and property of the debtor under any agreement or applicable law." 11 U.S.C. § 502(b)(1). For this reason, and following the logic of *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), Regency can have no allowable claim against these debtors, dischargeable or not, unless Regency can prove that it is entitled to relief under some cause of action recognized by state or federal law. There is no independent state or federal cause of action for "willful and malicious injury" *per se.* Of course, Regency cannot recover anything against nondebtor Akin Gump either unless it proves some cause of action under state or federal law.

■ *Civil conspiracy to defraud.*—The only cause of action that Regency has actually pled against Akin Gump and the debtors other than Grady Vaughn is "civil conspiracy to defraud." The elements of an actionable civil conspiracy are:

(1) the involvement of two or more persons;

(2) an object to be accomplished;

(3) a meeting of the minds on the object or course of action;

(4) one or more unlawful, overt acts; and

(5) damages as the proximate result.

*First Interstate Bank of Texas v. S.B.F.I., Inc.,* 830 S.W.2d 239, 249 (Tex.App.—Dallas 1992, no writ).

 The Court finds initially that all of the events complained of by Regency—*i.e.,* the corporate transactions that Regency claims denuded Chama and devalued the Chama stock held by NCNB and its successors as collateral—occurred during the first three months of 1990. In Texas, the statute of limitations on civil conspiracy claims is two years. *Stevenson v. Koutzarov,* 795 S.W.2d 313, 318 (Tex.App.—Houston [1st Dist.] 1990, writ denied). Therefore, Regency's civil conspiracy claim appears at first glance to be time barred. However, the statute of limitations on fraud claims is four years. *Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990). Assuming, without deciding, that Regency's claims for "civil conspiracy to defraud" are not time barred, this Court finds that Regency has not produced, and cannot produce, a preponderance of the evidence that any "unlawful, overt acts" of fraud were committed or contemplated, with respect to the 1990 Transactions or anything else, by Grady Vaughn, LEI, Kelso, Akin Gump, or the Five New Mexico Corporations. As the Court has already found, there was simply no misrepresentation to NCNB or its successors by Grady Vaughn or any of the other defendants; therefore, there was no "overt, unlawful act" of fraud; therefore, none of the other defendants can be liable for "civil conspiracy to defraud" under Texas law.

Regency makes much of the fact that James Scarantino, an attorney hired by Kelso to defend Chama against the government enforcement actions, has testified as follows:

> Malcolm Kelso was laughing, chortling about the efforts the state made. These were sham corporations designed to frustrate the state in its prosecution. And he said something like "those fools." He said "the real reason we did this was to [f]---] the bank."

And I remember that. That's a direct quote. And that's when he described these transactions as a rat trail down which—that it was all set up with this Allen Miller and Akin, Gump to do these half-million dollar deals, these huge deals. And that's why he uses them. And they've got the best corporate lawyers in the world to create this rat trail so no bank would ever want to go after Grady's interest in Chama Land & Cattle, because it wasn't worth anything; and to follow it, you would have to go down this—he liked the word "rat trail," follow all the assets down here that have been leased out for the next hundred years so no one could get after it. That's when he bragged how smart this was and what a great job he and Akin, Gump did in putting this all together.

*If* the Court found that this testimony was probative of Kelso's intent in participating in the 1990 Transactions, the testimony does *not* show any intent to misrepresent anything to the bank or induce the bank to rely on any sort of misrepresentation. Mr. Scarantino's testimony, therefore, simply cannot be probative of civil conspiracy to defraud.

***Other causes of action not pled.***—Regency has suggested in its briefs that it believes it has proven the defendants' liability for "civil conspiracy to hinder a secured creditor." Section 32.33(b) of the Texas Penal Code provides:

> A person who has signed a security agreement creating a security interest in property or a mortgage or deed of trust creating a lien on property commits an offense if, with intent to hinder enforcement of that interest or lien, he destroys, removes, conceals, encumbers, or otherwise harms or reduces the value of the property.

Regency further suggests that the defendants have engaged in a civil conspiracy to violate 18 U.S.C. § 1014, which reads:

> Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment,

or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Finally, mention was made, during trial, of other causes of action for which the defendants might be liable, such as tortious interference with business relations and conversion.

■ However, Regency neither pled these causes of action nor sought any amendment of its complaint to so plead. The Court further notes that the statute of limitations is two years for each of these causes of action. *See* Tex.Civ.Prac. & Rem.Code § 16.003; *Stevenson v. Koutzarov,* 795 S.W.2d 313, 318 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (civil conspiracy); *First National Bank of Eagle Pass v. Levine,* 721 S.W.2d 287 (Tex.1986) (tortious interference); *Hansler v. Mainka,* 807 S.W.2d 3, 5 (Tex.App.—Corpus Christi 1991, no writ) (conversion). Although Regency argues that the statute of limitations is extended by virtue of Regency's status as a purchaser from the FDIC,[6] the Court disagrees.

■ For purposes of the following analysis, the Court assumes *arguendo* that FDIC, which became receiver for First Republic Bank, Dallas, N.A., in 1988, retroactively received the benefit of the 1989 FIRREA statute's extended statute of limitations (codified at 12 U.S.C. § 1821(d)(14)) for any causes of action available to FDIC in connection with the Vaughn loan. *See FDIC v. Howse,* 736 F.Supp. 1437, 1446 (S.D.Tex.1990) (FIR-

REA's extended statute of limitations provision is procedural and applies retroactively); *accord William C. Davidson, P.C. v. Mills,* 821 F.Supp. 1176, 1178–79 (W.D.Tex.1993). The purpose of § 1821(d)(14) is to strengthen the enforcement powers of federal banking regulators. *Howse,* 736 F.Supp. at 1444. The Fifth Circuit Court of Appeals has held that, in keeping with Congress's policy of enhancing the marketability of failed bank assets, the extended period applies to the FDIC's assignees, so that buyers of bank assets may stand in the FDIC's shoes. *FDIC v. Bledsoe,* 989 F.2d 805 (5th Cir.1993). Thus, for example, if tortious acts surrounding the Vaughn loan had occurred in 1987 and NCNB had bought the loan from the FDIC in 1989, the Court would have no trouble finding that NCNB's limitation period for suing the tortfeasors would run for three years, beginning on the date FDIC's receivership began in 1988. *See* 12 U.S.C. § 1821(d)(14)(B) (the extended limitations period begins to run the *later* of (i) the date of the appointment of the FDIC as receiver or (ii) the date on which the cause of action accrues). However, none of the acts complained of by Regency occurred until 1990— long *after* the FDIC had sold the Vaughn loan to NCNB. FIRREA's extended limitations period simply does not reach far enough to insure that any purchaser of a loan from the FDIC has at least three years to sue tortfeasors for whatever tortious acts may occur in connection with the loan *after* the purchase. Therefore, NCNB's limitation period began when the alleged tortious acts occurred, in 1990,[7] and ran for two years pursuant to state law.

---

6. *See* 12 U.S.C. § 1821(d)(14)(A) ("Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the [FDIC] as conservator or receiver shall be ... (ii) in the case of any tort claim, the longer of (I) the 3–year period beginning on the date the claim accrues; or (II) the period applicable under State law."); *FDIC v. Bledsoe,* 989 F.2d 805 (5th Cir.1993) (the longer statute of limitations granted by § 1821(d)(14) applies to the FDIC's assignees as well as to the FDIC itself).

7. Regency argues that the conspiratorial acts continued long after 1990, noting specifically

that certain warrants for Chama stock were exercised in 1993. However, the Court finds that any conspiracy surrounding the warrants necessarily occurred at the time of the warrants' issuance in 1990. The warrants were designed in 1990 to be triggered upon the occurrence of certain events, and the fact that such events did not occur until 1993 does not mean that the conspiracy continued until 1993. Moreover, the Court has already found that the 1990 Transactions, including the issuance of the warrants, were not concealed from NCNB and in fact were made known to NCNB in June 1990.

■ The fact that the FDIC repurchased the Vaughn loan from NCNB in 1991 does not endow the FDIC and its successor, Regency, with a brand new FIRREA limitations period. *See FDIC v. Bledsoe*, 989 F.2d 805, 811 n. 8 (5th Cir.1993) ("To prevent the possibility of an infinite period of limitations the FDIC cannot receive a *new* six year period every time it receives a note.... [T]he FDIC cannot gain an additional six years by assigning the note to a private party and then receiving it again."). This result is not altered by 12 U.S.C. § 1823(d)(3)(A), which states: "With respect to any asset acquired or liability assumed pursuant to this section [*e.g.*, pursuant to an "assistance agreement"], the [FDIC] shall have all of the rights, powers, privileges, and authorities of the [FDIC] as receiver under [12 U.S.C. § 1821]." Even if, in 1991, the FDIC received an extended three-year statute of limitations for the tort actions Regency now seeks to assert, that three-year period began to run on the later of (i) the date of the appointment of the FDIC as conservator or receiver or (ii) the date on which the cause of action accrued. 12 U.S.C. § 1821(d)(14)(B). The *only* time the FDIC was appointed as conservator or receiver of an entity owning the Vaughn loan was in 1988. Therefore, any new three-year statute of limitations acquired by the FDIC in 1991 began to run in the first quarter of 1990, when the causes of action accrued,[8] and expired sometime in the first quarter of 1993—well before any of the debtors filed their bankruptcy petitions (which might have tolled the running of the statute of limitations under 11 U.S.C. § 108(c), had the limitations period not already expired) and well before Regency filed its lawsuit in January 1994.

***Claims against Grady Vaughn.***—The Court finds that Regency has not sustained its burden of proof against Grady Vaughn under § 523(a)(2) for the reasons stated above, *i.e.*, Regency has not shown that Grady Vaughn made any misrepresentations to NCNB or its successors about the 1990 Transactions or engaged in any actual fraud in inducing NCNB to extend credit. The Court has, further, failed to prove that Grady Vaughn perpetrated any "willful and malicious injury" to NCNB, its successors, or their property. It is *conceivable* that Grady Vaughn could have inflicted a "willful and malicious injury" in the course of his breach of the Loan Agreement. However, Regency has not shown, and cannot show, by a preponderance of the evidence that Grady Vaughn's conduct was "willful and malicious."

■ The Court of Appeals for the Fifth Circuit breaks down the cause of action for § 523(a)(6) into two elements: (1) a wrongful act intentionally done (*i.e.*, willful); and (2) which *necessarily* causes harm and is without just cause or excuse (*i.e.*, malicious). *Chrysler Credit Corporation v. Perry Chrysler Plymouth*, 783 F.2d 480, 486 (5th Cir. 1986), cited in *In re Chavez*, 140 B.R. 413, 421 (Bankr.W.D.Tex.1992). Regency has not shown that the diminution of the Chama stock, if indeed diminution occurred, *necessarily* caused harm to Regency. No harm would have occurred if Grady Vaughn had been able to repay the loan by other means. Nor has Regency shown that the 1990 transactions were "without just cause or excuse." On the contrary, the defendants have shown, and the Court finds, that Grady had a very urgent "just cause or excuse" for allowing the diminution of the Chama stock: he was faced with complete forfeiture of the Chama Ranch property to state and federal wildlife authorities. The dispersion of Chama's equity interests ultimately resulted in the preservation of the Chama Ranch assets from that threat of forfeiture.

### CONCLUSION

The Court concludes that Regency has not proven, and cannot prove, any of the causes of action alleged in Adversary No. 394–3007 against Akin Gump or debtors LEI, Kelso, or the Five New Mexico Corporations. Regency cannot prevail on any of those causes of action, all of which are necessarily grounded in tort, for the reasons stated *supra*. The Court further concludes that Regency has proven a breach of contract claim against Grady Vaughn in an as-yet undetermined

---

8. *See* notes 2 and 7, *supra*.

amount. Finally, the Court concludes that Regency has not proven, and cannot prove, any nondischargeability claim against debtors Kelso or Grady Vaughn under 11 U.S.C. § 523 for the reasons stated *supra*.