## In re LEGAL ECONOMETRICS, INC., Debtor.

### Gary W. VAUGHN, et al., Plaintiffs,

v.

### Grady H. VAUGHN, III, et al., Defendants,

v.

### AKIN, GUMP, HAUER & FELD, f/k/a Akin, Gump, Strauss, Hauer & Feld, a Texas General Partnership, et al., Third Party Defendants.

Bankruptcy Nos. 393–35603–HCA–11, 393–37001–HCA–7.
Adv. Nos. 393–3422, 393–3412.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Nov. 3, 1995.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

HAROLD C. ABRAMSON, Bankruptcy
Judge.

The Court makes the following findings of
fact and conclusions of law with respect to
the trial of the claims and causes of action of
Third Party Plaintiff, Grady H. Vaughn, III,
("Grady") against the Third Party Defen-
dants Akin, Gump, Hauer & Feld, f/k/a Akin,
Gump, Strauss, Hauer & Feld, a Texas gen-
eral partnership; Akin, Gump, Hauer &
Feld, L.L.P.; J. Stephen Hatfield; J. Ste-
phen Hatfield, P.C.; Allen P. Miller; and
Allen P. Miller, P.C. (collectively the "Akin
Gump Defendants"). Grady contends that
he had an attorney-client relationship with
the Akin Gump Defendants and that certain
of their actions constitute negligence, gross
negligence, intentional breach of fiduciary
duty, and civil conspiracy. The parties previ-
ously agreed to a nonjury trial; further, the
Akin Gump law firm filed a proof of claim in
Grady's bankruptcy proceeding. Therefore,
this is a claim and counterclaim action be-
tween Akin Gump and Grady, and the Court
has jurisdiction over this matter pursuant to
28 U.S.C. §§ 157(b)(2)(A), –(B) & –(O).

### FINDINGS OF FACT

#### The Chama Ranch and the New
#### Mexico Investigation

As of November 3, 1989, Grady owned
slightly more than two-thirds of all the issued
and outstanding shares of stock in Chama
Land & Cattle Company, Inc. ("Chama").
The remaining issued and outstanding shares
of stock were owned by Grady's brother,
Gary Vaughn. Among the assets of Chama
as of November 3, 1989, were 32,000 acres of
real property in Rio Arriba County, New
Mexico ("Ranch"), within which were two
separately fenced game parks ("Game
Parks"), each of 3,200 acres in size. Chama
also owned a 10,828 square foot lodge, vari-
ous wildlife, an airstrip, perimeter fencing,
and other buildings and improvements, all of
which were located on the Ranch, as well as

Broadus A. Spivey, Rick Leeper, Thomas
P. Prehoditch, Spivey, Grigg, Kelly & Knise-
ly, Austin, Texas, for Grady H. Vaughn, III.

Robert S. Harrell, Fulbright & Jaworski,
L.L.P., Houston, Texas, for third party de-
fendants.

two Class–A game park licenses issued by the State of New Mexico.

Sometime in late 1988 to early 1989, U.S. and New Mexico authorities began an investigation into charges that employees of Chama and Chama itself were involved in the interstate transportation of stolen game. As a result of its investigation, on December 23, 1989, the State of New Mexico ("State") handed down grand jury indictments of certain ranch employees of Chama, alleging violations of New Mexico law. The State also handed down a separate, three-count, grand jury indictment against Chama, alleging transportation of stolen livestock and an attempt to evade or defeat taxes. Subsequently, the State also instituted civil actions against Chama and various related corporations.

### Kelso's and Akin Gump's "Reorganization Plan"

In November 1989, Grady was introduced to Malcolm Kelso, the president of a company called Legal Econometrics, Inc., ("LEI") and a self-styled crisis manager.[1] Grady initially retained Kelso/LEI to represent him in matters involving the Pan American Produce Company and a bank loan to Amarillo National Bank. LEI or Kelso was to be compensated at an hourly rate for services rendered by Kelso in connection with these activities. Kelso subsequently persuaded Grady to expand the scope of LEI's employment to include the Chama matters and an apartment building in Dallas, Texas, known as The Residences on McKinney.[2] Kelso acted as agent and representative of Grady and Chama in dealing with all the Chama

matters, and he was expressly and impliedly authorized by Grady to do so. Among the problems facing Chama in late 1989 and early 1990 were the civil and criminal claims made by New Mexico authorities against Chama.

During November and December 1989, after Kelso personally investigated the New Mexico situation, he persuaded Grady, through misstatements and misrepresentations, that the problems besetting Chama were extremely serious; he also strongly recommended unconventional solutions. Specifically, Kelso (and LEI through Kelso) represented to Grady and the Vaughn entities[3] that the activities of the State of New Mexico regarding Chama posed a substantial threat to Grady, the Vaughn entities, and their assets; and he urged that reorganization and restructuring of Chama were necessary for their protection. Kelso further expressed concern that the New Mexico lawyers previously hired to deal with the Chama situation were not properly handling the matters assigned to them, and he stated that other lawyers must be brought in to deal with the situation. Among other things, Kelso criticized the New Mexico lawyers for having failed to "seal off" Grady and the other Chama officers and officials from the investigation.

In December 1989, Kelso introduced Grady to Allen P. Miller ("Miller") and J. Stephen Hatfield ("Hatfield"), who were lawyers acting on behalf of Akin, Gump, Hauer & Feld and their professional corporations.[4] Miller was to aid Chama, through Kelso and Grady, with Chama's problems with the State of New Mexico. Kelso acted as an agent for

---

1. Kelso also owns LEI's stock. The Court has found previously that LEI is the alter ego of Kelso. Thus, when LEI is referred to, Kelso is referred to as well, and vice versa.

2. The latter was collateral for a loan to NCNB Texas National Bank.

3. The Vaughn entities or interests include several trusts and corporations, such as the Grady Hamilton Vaughn III Children's Trust No. 2, of which Grady's adult son is the only beneficiary; the Grant Ellis Vaughn Trust No. 2, of which Grady's minor son is the only beneficiary; the Gary William Vaughn Support Trust ("GWV Support Trust"), of which Grady's brother Gary is the

only beneficiary; GWV Interests, Inc., a Texas corporation owned 100 percent by the GWV Support Trust; and GWV Ltd., a Texas limited partnership owned by the GWV Support Trust and GWV Interests, Inc.

4. Akin, Gump, Hauer & Feld, f/k/a Akin, Gump, Strauss, Hauer & Feld, was a Texas general partnership at all relevant times until Akin, Gump, Hauer & Feld registered as a Texas limited liability partnership known as Akin, Gump, Hauer & Feld, L.L.P. (which, together with its predecessors-in-interest, will be referred to as "Akin Gump").

Grady in dealing with Miller and Hatfield, although at various times during the relationship Akin Gump attorneys sometimes communicated directly with Grady. *See* Exhibits A and B. There was no corporate action by Chama engaging Miller, Hatfield, or the firm of Akin Gump.

At the time Miller was engaged to work on the Chama problems, neither Kelso nor Miller disclosed to Grady that they had a personal relationship. Kelso and Miller and their wives ate dinner together occasionally, and Kelso and Miller played tennis together occasionally. Miller and Kelso also did not disclose to Grady that Akin Gump had previously represented Kelso and LEI, or that Akin Gump continued to do work for Kelso, even though Miller and Hatfield were engaged to work on the Chama problems for Grady and Chama. There was no disclosure that Hatfield had previously represented Kelso.

Other attorneys at Akin Gump also were brought in by Miller and Hatfield to assist in Akin Gump's representation of Grady and Chama. Akin Gump, Miller, Hatfield, and the other Akin Gump lawyers working on the Chama matter were retained by Grady through Kelso, as Grady's agent and representative, to provide legal representation to and for Grady and Chama.

Kelso specifically chose Akin Gump to assist Grady and Chama in handling the New Mexico situation, rather than the law firm of Seeligson and Steinberg ("Seeligson"), and specifically John Falconer ("Falconer"), who had been representing Grady. Kelso thought that Falconer, as an estate-planning lawyer, was ill-equipped to handle the Chama matter, as was the Seeligson firm, which did not handle large securities transactions. Kelso represented to Grady that Akin Gump,

particularly Miller and Hatfield, were well-suited to handle Grady's affairs because of their experience in large-scale corporate and financial restructures. Grady also thought it advisable to employ Akin Gump as his attorneys on the corporate reorganization, rather than Falconer and his partner Scott Bush, because Akin Gump specialized in sophisticated corporate reorganizations, whereas Falconer was a probate and tax lawyer and Bush was a bankruptcy practitioner.

Beginning with Akin Gump's representation of Grady and Chama in December 1989, Miller suggested an elaborate reorganization scheme of Chama and its assets as a means of blunting the actions of the New Mexico authorities, which threat had been greatly overstated and misrepresented to Grady by Kelso. Miller and Kelso developed the strategy that Chama be reorganized in a manner such that it would be stripped of its principal assets, which assets would then be placed in newly created or largely dormant existing corporations. In the following months, at the suggestion and insistence of Kelso, Miller, and Hatfield, Chama's assets were dispersed into several corporations, again on the theory that such a maneuver was necessary if Chama was to be saved from the "attacks" of New Mexico authorities. In this connection, Chama then executed long-term, fifty-year leases as to the Game Parks, the lodge, and other assets owned by Chama. Miller's plan also placed Kelso/LEI in control of other entities owned by Grady and his brother Gary and of Chama. This result was accomplished by the installation of Kelso as voting trustee of the Grady stock interests in several corporations that were created or reconstituted as a consequence of the reorganization.[5]

---

**5.** The major aspects of the "reorganization" implemented by the Akin Gump Defendants and Kelso (with all Grady interest signatories acting on the advice of lawyers at Akin Gump) were as follows:

a. On January 18, 1990, Chama leased the Game Parks to American Elk Conservatory, Inc. ("Conservatory") for a term of fifty years with a fifty-year option to renew. Under the terms of the Game Park lease, Conservatory was also transferred Chama's rights to the two Class-A game park licenses issued to Chama by the State of New Mexico ("Licenses").

b. On January 26, 1990, Chama issued warrants for the purchase of 31,582 shares of stock in Chama to Antigone Corporation ("Antigone") for stated consideration valued at $1,353,288.70. Later, by a Warrant Agreement dated February 13, 1990, Chama issued warrants for 3,446 shares of stock in Chama to Antigone for stated consideration valued at $147,661.10. The Chama–Antigone Warrants contained identical terms and conditions.

c. On February 12, 1990, Kelso as voting trustee, Antigone, and its shareholders executed

Because of the nature of the voting trusts, a resignation letter was to be drafted by Hatfield to be signed by Kelso so that Kelso could be removed as voting trustee at a subsequent date on the decision of Grady and the Vaughn interests. Grady relied on this expectation of such letter. The Court finds that this letter was never prepared. The fact that it was not prepared was not known to Grady and the other Vaughn interests because of Akin Gump's, and specifically Hatfield's, failure to apprise them of this fact. John Nichols ("Nichols"), for example, would not have signed the voting trust agreements if he had known that the resignation letter was never signed by Kelso.[6]

In November 1990, all of the voting trust agreements that were created during the Spring and Summer of 1990 were amended to make Miller the successor voting trustee, replacing Grady's wife and adult child in this capacity and expanding the conflicts of interest of Akin Gump and Miller. The voting trusts were used as the principal mechanism by which Kelso and the Akin Gump Defendants ultimately deprived Grady and Gary Vaughn of their control of Chama. Each of the voting trusts installed Kelso as voting trustee for a period of fifty years, a period

the Court finds to be unconscionable. In the Court's view, the substitution of Miller as substitute trustee is the most egregious aspect of this case.[7]

### Reflection on Akin Gump's Conduct and Actions

Although various officials of Chama and other Vaughn entities participated in the discussion of how the "reorganization" of Chama was to be implemented, each of these individuals had to rely and depend on the advice and expertise of Akin Gump, Miller, and Hatfield because of the control by Kelso. Akin Gump and its attorneys Miller and Hatfield provided most of the legal services incident to the preparation and implementation of such contractual undertakings, under the direction of Kelso/LEI.

In consulting with Chama, Grady, and other officials of Chama and the Vaughn interests, no one at Akin Gump ever advised Grady or his representatives, including Nichols, Falconer, and William Drozd ("Drozd"), that Akin Gump, Miller, or Hatfield were not representing Grady and Chama. No such statements were ever made in writing or verbally. Grady and the Vaughn representa-

---

a voting trust agreement. John Nichols ("Nichols"), as president of Antigone, signed on its behalf. The voting trust agreement was also signed by all shareholders. An additional voting trust making or affirming Kelso as voting trustee of Antigone and covering newly issued shares of Antigone was implemented several months later upon the issuance of these shares.

 d. On February 12, 1990, Kelso as voting trustee, American Elk Conservatory Holdings, Inc. ("Holdings"), and its shareholders executed a voting trust agreement. Nichols, president of Holdings, signed the agreement on its behalf, and all shareholders signed the agreement.

 e. On March 2, 1990, some Chama assets were sold, transferred, and assigned to Conservatory, including all of Chama's right, title, and interest in and to (i) all elk, whether in the Game Parks or on the Ranch ("Elk"), and (ii) all causes of action owned by Chama against the State of New Mexico. In addition, the Lodge at Chama, Inc. ("Lodge") and Conservatory executed a lease that entitled Conservatory to have the Elk graze on the Ranch property outside the Game Parks ("Grazing Lease"). Kelso, as president of Conservatory, signed the Grazing Lease on its behalf. Grady, as president of the Lodge, signed the Grazing Lease on its behalf.

 f. On March 2, 1990, effective as of February 21, 1990, Chama leased the Ranch, exclusive of

the Game Parks, to the Lodge for a term of fifty years with a fifty-year option to renew ("Ranch Lease"). William Drozd ("Drozd"), as secretary treasurer of Chama, signed the Ranch Lease on its behalf; and Grady, as president of the Lodge, signed the Ranch lease on its behalf.

 g. On July 25, 1990, Kelso as voting trustee, Oyster Bay Financial, Inc. ("Oyster Bay"), and its shareholders executed a voting trust agreement. Drozd, as president of Oyster Bay, signed the agreement on its behalf. The voting trust agreement was also signed by all shareholders.

 Incidentally, the Court voided these transactions as born out of fraud by Kelso in the Court's Findings of Fact and Conclusions of Law Regarding Order Confirming Trustee's Plan of Reorganization. *See, e.g., In re The Lodge at Chama, Inc.,* No. 393–38329–HCA–11 (Bankr. N.D.Tex. August 18, 1995).

**6.** Nichols signed voting trusts on behalf of Holdings and Antigone. *See supra* note 5.

**7.** Miller's appointment as successor voting trustee over Grady's stock would constitute an usurpation of power over businesses by an attorney who had not been invited to take such a position, which is tantamount to taking the property of a client.

tives all reasonably believed from their course of dealings that the Akin Gump Defendants represented Grady and Chama, and that Kelso was acting with full authority as Grady's and (Chama's) agent and representative with respect to all matters involving Chama. Grady, Nichols, and Drozd often talked to Akin Gump attorneys with no other attorneys present and gave these attorneys confidential information about Chama and related entities. Attorneys at Akin Gump also, on at least two occasions, sent correspondence and trust documents directly to, and communicated directly with, Grady, rather than going through any other attorneys who may have represented him.[8] Such direct communications demonstrate the incredibility of the denial by the Akin Gump Defendants that they represented Grady. The Court would note that, if the circumstances were as Hatfield and Miller suggest, such that the Akin Gump Defendants represented Kelso/LEI and other counsel represented Grady with regard to the Chama matters, these communications by the Akin Gump lawyers would be in violation of the State Bar Rules governing the conduct of attorneys. Tex. Disciplinary R.Prof. Conduct 4.02 (1989), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. (Vernon Supp.1995) (State Bar Rules art. X, § 9). The Court finds that the denial by the Akin Gump Defendants of their representation of Grady and Chama with regard to the Chama "reorganization" is not credible, and that the actions of the Akin Gump Defendants were clear manifestations of an attorney-client relationship between the Akin Gump Defendants and Grady and Chama.

Falconer was never in a position to controvert the attorneys of Akin Gump. Akin Gump and its attorneys were hired by Kelso and Grady to assist with the Chama problem; they were responsible for the design and implementation of the elaborate Chama reorganization; and they prepared most of the documentation regarding the reorganization. Akin Gump was paid by Grady and his entities, directly and indirectly through Kelso, for its work on the reorganization.

8. *See* Exhibits A & B.

The evidence of the negligence of the Akin Gump Defendants with respect to their representation of Grady is extensive. Akin Gump attorneys never advised Grady of the conflicts and potential conflicts of interest that existed when Grady signed the voting trusts both in his individual capacity, and more importantly, in his capacity as trustee for his brother, Gary Vaughn. Nor did Akin Gump attorneys advise Grady of the serious consequences that might flow from the implementation of the reorganization plan.[9] Further, the Akin Gump Defendants never advised Grady about the conflicts and potential conflicts that existed with regard to the roles he had in the corporate reorganization, and more importantly, the conflicts the Akin Gump Defendants had as lawyers in creating the vehicles whereby Kelso was placed in the position of voting trustee in relation to Grady's stock and the Vaughn corporations. The Akin Gump Defendants also failed to disclose their agenda in the representation of Kelso/LEI, a disclosure that was required by State Bar Rules. *See* Tex. Disciplinary R.Prof. Conduct 1.06 (1989). Finally, the Akin Gump Defendants also did not disclose to Grady the extent of Kelso's personal relationship with Miller of Akin Gump.

### Subsequent Legal Services by Akin Gump for Antigone and Oyster Bay

Antigone later acquired certain obligations that Grady incurred with a third party bank. This acquisition was made at the direction of Kelso. In addition, Antigone had a loan agreement with Grady pursuant to which funds were lent to him. This loan agreement was implemented at the direction of Kelso. Akin Gump provided legal services in conjunction with the activities of Antigone after Kelso became voting trustee, including the acquisition of such obligations and the establishment of the loan agreement. Oyster Bay also later acquired an obligation which Grady had to a third party bank. This acquisition was also done at the direction of Kelso, and Akin Gump provided legal services to Oyster Bay in the conduct of its business after Kelso

9. The reorganization—the leases, voting trusts, and other transactions described in note 5 *supra*—took away Grady's control of his property.

became the voting trustee of its shares, including the acquisition of this obligation. Akin Gump was representing all sides without getting permission as required by the State Bar Rules. Tex. Disciplinary R.Prof. Conduct 1.06 (1989).

### Events Subsequent to the Chama "Reorganization" and Facts Relating to Damages

On June 15, 1993, the Chama–Antigone Warrants were exercised. As a result of the exercise of the Chama–Antigone Warrants, the shareholders of Chama were alleged to be as follows—Grady, with 48.7 percent of the stock; Gary Vaughn with 22.1 percent of the stock; and Antigone with 29.2 percent of the stock. Kelso/LEI also claim to be entitled to one-third of the stock of Chama.[10]

Kelso's representations to Grady and the Vaughn entities about the dangers presented by the activities of the State of New Mexico and the intent of the State, including a RICO-type case to obtain forfeiture of the Chama Ranch, later turned out to be false. The State did not believe that it had any actionable civil or criminal claims against Grady or Gary Vaughn and had not seriously considered threatening a RICO-type action with forfeiture of the Chama Ranch. In fact, the New Mexico authorities only began thinking about such an action after Kelso/LEI entered the picture and began making misrepresentations to the State. Grady was not aware of the extent of Kelso's misrepresentations and deceptions regarding Chama until June 1995 when he heard new testimony, including the testimony of two New Mexico State officials, John Paternoster, the special prosecutor responsible for the Chama matters, and Chester Walter, the elected district attorney. They testified that Kelso was an impediment to the settlement and resolution of the Chama litigation be-

cause of his apparent motivation to churn fees.

LEI charged Grady and the Vaughn entities huge sums of money for activities allegedly related to the defense of the actions undertaken by the State on the premise (propounded by Kelso) that the State's activities presented a threat to Grady and the Vaughn entities. Kelso withheld information regarding the status of the matters in New Mexico and exaggerated the dangers presented by the New Mexico matters for the purpose of acquiring large sums of money for himself and LEI to use allegedly in the defense of the New Mexico matters and for the purpose of acquiring control of Grady's and the Vaughn entities' assets. Kelso/LEI charged the Vaughn entities well over $3 million and were paid well in excess of $2 million by these entities.[11] Akin Gump charged the Vaughn interests approximately $85,000 for the work it did on the Chama "reorganization."

In May 1991, Gary Vaughn filed suit against Grady, the Vaughn entities, and others, complaining of most, if not all, of the transactions and activities that resulted from implementation of the plan developed by Kelso/LEI and the Akin Gump Defendants. Gary Vaughn, as part of this action, raised issues concerning the propriety of many of the transactions and sought damages from Grady, the Vaughn entities, and various other parties. Nichols also filed suit against Grady, Antigone, Oyster Bay, The Grayrock Corporation ("Grayrock"), and others complaining of the transactions and activities developed and implemented by Kelso/LEI and the Akin Gump Defendants, or under their oversight and direction, and sought damages from Grady, Antigone, Oyster Bay, and Grayrock. As a result, an order was entered ultimately in March 1992 following an injunction hearing in a State District Court in Dallas County, Texas, which deprived Grady

---

**10.** At or about the time Kelso/LEI began proposing the reorganization, Kelso requested additional compensation from Grady. Grady and Kelso orally agreed that—in return for the completion of a successful reorganization of all of Grady's financial affairs and the Vaughn entities, which reorganization resolved Grady's financial problems and protected his assets and the assets of the Vaughn entities from the threats described by

Kelso—Grady would convey one-third of his nonexempt assets to Kelso.

**11.** In addition, Kelso got Grady to agree to convey one-third of his nonexempt assets to Kelso, following a successful reorganization of Grady's financial affairs and the Vaughn entities. *See supra* note 10.

of most, if not all, of his remaining income stream from the Vaughn entities. These events ultimately led Grady into further litigation, bankruptcy, and the financial crisis in which he now finds himself.

Kelso continued his efforts to manipulate the course of activities and events and to conceal the true facts from Grady, the Vaughn entities, and others. Only in late 1991 did the scope and extent of Kelso's self-dealing, concealment, and misrepresentations regarding the Chama matters begin to be revealed. At that time, Grady acted to remove Kelso as voting trustee of the companies created out of Chama in Akin Gump's "reorganization." Only in 1994, however, in the deposition of James Scarantino, was it revealed to Grady that Kelso had often asserted that he "stole the f***ing ranch."

Also in late 1991, Grady began to learn about the failures of the Akin Gump Defendants to disclose material information to Grady at the time of the 1990 transactions and about the Akin Gump Defendants' conflicts of interest and the manner in which they had aided and abetted Kelso's plan to deprive Grady and the Vaughn entities of their property. He wrote Akin Gump on December 2, 1991, noting that, as Akin Gump knew, Akin Gump had rendered legal services on behalf of himself and the Vaughn entities in the past, and that Kelso had provided advice and assistance to Grady and these same entities. Grady then asked Akin Gump to desist from representing Kelso in matters adverse to his interests. Akin Gump lawyer Hatfield responded on December 13, 1991, that Akin Gump had represented Kelso and his company LEI for several years. Akin Gump did not disclaim representation of Grady in this letter. Grady filed his lawsuit against the Akin Gump Defendants on September 1, 1992.

A successful reorganization of Grady's affairs that protected Grady's assets and the assets of the Vaughn entities has never occurred. The plan devised and implemented by Kelso/LEI and the Akin Gump Defendants has had the opposite effect and proximately caused Grady and the Vaughn entities substantial damages.

## Synopsis

The foregoing constitutes detailed findings on the events underlying Grady's claims against the Akin Gump Defendants; the following constitutes what the court considers to be the crux of this case.[12]

About November 1989, Grady engaged Kelso as "crisis manager" to extract Grady and Chama from the problems they were facing in New Mexico. After this, Kelso acted as the agent and representative of Grady and Chama in dealing with all matters with respect to Chama. He was expressly (and impliedly) authorized by Grady to do so. There was no corporate action by Chama engaging Kelso.

Subsequently, Kelso introduced Grady to Akin Gump lawyers Miller and Hatfield, who were hired to work on the Chama matters. Although Kelso acted as an agent for Grady in dealing with Miller and Hatfield, Akin Gump attorneys sometimes communicated directly with Grady. *See* Exhibits A and B. Again, there was no corporate action by Chama engaging Miller, Hatfield, or the firm of Akin Gump. At the time Miller was engaged to work on the Chama problems, neither Kelso nor Miller disclosed to Grady that they had a personal relationship or that Akin Gump had previously represented Kelso/LEI and continued to do so.

Miller along with Hatfield, in consultation with Kelso and at various times with Grady, came up with various theories on how to dilute Chama's assets by creating other corporate entities to which Chama would execute long-term, fifty-year leases as to the land, Game Parks, and other assets owned by Chama. The effect of these transactions would be to tie up the land and Game Parks in the event the NCNB bank entity or its successor foreclosed on Grady's two-thirds

---

**12.** The Court is extremely familiar with the events, individuals, and entities involved in this case, as the bankruptcies of Grady, Kelso, LEI, Chama, Antigone, and other related corporations have been pending in this Court for more than two years. A number of adversary proceedings related to these cases and concerning these facts have also been pending in this Court for some time.

stock ownership in Chama.[13] If in effect, the long-term, fifty-year leases would cause the new stockholder problems in the control of Chama.

Miller also came up with the theory of creating and using the long-term voting trusts, of which Kelso was the trustee for a fifty-year period. Four voting trusts were created;[14] Hatfield, aided by another Akin Gump attorney named Fernandez, drafted the documents. These trusts were an additional means of tying up the Chama assets.

Hatfield was to draft the resignation letter, which was to be signed by Kelso, to allow Grady and the Vaughn interests to remove Kelso as voting trustee. The letter was necessary because of the pervasive nature of the voting trusts. Hatfield never prepared the letter, however. Miller explains this omission by stating that the letter would be a fraud on the State of New Mexico in the following regard: Kelso was dealing with the State of New Mexico, assuring the State's representatives that he was in control rather than Grady or any employees of Grady or Chama. Regardless, however, Grady understood that there was to be some mechanism to fire Kelso as voting trustee, and the Akin Gump Defendants failed to provide such a mechanism. In addition, Hatfield failed to inform Grady and the Vaughn representatives of this omission.

All of the voting trusts and leases were completed and executed no later than July 31, 1990. In November 1990, the voting trusts were amended to make Miller the successor trustee to Kelso. This substitution of Miller was for a term longer than the life expectancy of Miller and Kelso. One would think an attorney would be more circumspect before becoming a successor trustee, fully disclosing to the client the ramifications of the act and obtaining the client's consent. This activity by Miller and the Akin Gump lawyers, to wit Miller, Hatfield, and Fernandez, was not justified. The result of Miller's becoming the successor trustee would be the continued divestiture of Grady and the other shareholders from their own property, to wit the stock in corporations that had been the property of and had controlled the property of Grady prior to the involvement of Miller and the Akin Gump law firm. The Court finds that the purpose of the substitution was to intrude upon the control of property belonging to the Vaughn interests, which was furthered by the draftsmanship of Hatfield and Fernandez.

Although Grady was represented by other counsel during this time period, including John Falconer and Scott Bush, these individuals were not engaged to and did not represent Grady and Chama with regard to the above-described "reorganization" of Chama's assets. The Court recognizes that at times the Akin Gump Defendants consulted with Grady's other attorneys. At other times, however, the Akin Gump Defendants communicated with Grady directly. There were also contacts between Akin Gump and Kelso, and thereafter between Kelso and Grady or other representatives of Grady. Falconer's and Bush's role in the Chama transactions was of a passive nature. Regardless, at all times the Akin Gump Defendants were acting on behalf of Kelso, who was acting as the agent of, and fiduciary for, Grady as well as the other shareholders who signed the voting trusts.

Miller and Hatfield knew or should have known the consequences of their acts in preparing the documents that resulted in the long-term leases and the voting trusts; the consequences were to frustrate the bank that might want to foreclose on Grady and to frustrate and cause the State of New Mexico to back away from its position as to the lawsuit against the Vaughn interests and Chama and from the criminal actions against Chama. The Court recognizes that Grady participated and consented to this result. At the time of his consent, however, Grady believed that Miller, Hatfield, and Akin Gump were his attorneys and were representing his best interest. As Grady later learned, the Akin Gump Defendants were not acting solely in his best interest, but also on behalf of Kelso, which was a direct conflict of interest.

---

**13.** Grady had pledged the stock to NCNB Texas National Bank as part of a financial restructuring in 1988.

**14.** *See supra* note 5.

The consequence of the Akin Gump Defendants' actions was to give Kelso a place of control and ownership to which he was not entitled and which would involve the divestiture of the Grady interests of their property. The Court finds the conduct of the Akin Gump Defendants created a risk of extreme harm to Grady, and that the Akin Gump Defendants acted with conscious indifference to the risk of harm created by their actions.

The conduct of Akin Gump, and its attorneys Miller and Hatfield, described above constitutes: (a) negligence; (b) gross negligence; and (c) breach of fiduciary duty. The acts of negligence, gross negligence, and breach of fiduciary duty by Akin Gump and its attorneys Hatfield and Miller, as described above, were proximate and direct causes of actual damages to Grady.

### Discovery of Injury

Grady did not discover, nor should he have discovered through the exercise of reasonable care and diligence, the facts establishing the elements of his cause of action against the wrongdoing of the Akin Gump Defendants until after September 1, 1991. About November 1991, Grady learned of the agenda of the Akin Gump Defendants to aid Kelso. Not until such time did Grady have any facts that indicated to him that his interests and Chama's interests were not represented or protected in the Chama "reorganization" by Miller and Hatfield. The Court finds Grady's failure to discover the essential facts prior to that time was reasonable, inasmuch as the attorneys possessing the information and responsible for informing him of these facts failed to do so.

### Damages

The Court found the testimony of Grady's economist credible as follows: he testified that Grady had an earning capacity of $100,000 a year for ten years. As the record indicates, Grady's loss of earning capacity due to the gross negligence of the Akin Gump Defendants was one million dollars. The cost of litigation resulting from Grady's hiring of attorneys to attempt to divest Kelso of his control of Grady's assets and to extricate Grady from the situation he was placed in by the Akin Gump Defendants, who he thought were acting in his own interest but

in fact were not, was three million dollars. The Court finds that Akin Gump, Miller, and Hatfield were each 25 percent responsible for the damages to Grady; Miller, P.C. and Hatfield, P.C. were each 12.5 percent responsible for the damages. The amount of exemplary damages the Court finds should be assessed against each of the Akin Gump Defendants is as follows: Miller, one million dollars; Hatfield, one million dollars; Miller, P.C., $500,000; Hatfield P.C. $500,000; and Akin Gump, one million dollars.

### CONCLUSIONS OF LAW

#### Limitations

An initial question is whether limitations bars this lawsuit, which issue is determined by Texas law. Attorney malpractice actions are in the nature of a tort and are thus governed by the two-year statute of limitations set forth in Texas Civil Practice and Remedies Code § 16.003. *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988); *see also Resolution Trust Corp. v. Acton*, 49 F.3d 1086, 1089 (5th Cir.1995) (stating that the Texas statute of limitations for negligence, breach of fiduciary duty, and gross negligence is two years). For the suit to be timely under § 16.003, the plaintiff must bring it within two years of the date that the cause of action accrues. *Id.*; Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986). The determination of when a cause of action accrues is a judicial one. *Willis*, 760 S.W.2d at 644. One judicial determination made by the Texas Supreme Court in interpreting the application of § 16.003 in legal malpractice cases is that the discovery rule applies. *See id.* at 646. The discovery rule provides that the limitations period runs from the date the plaintiff discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of his or her cause of action. *Id.* at 644.

In finding that the discovery rule applies in legal malpractice cases, the Texas Supreme Court noted that attorneys are required to exercise the skill, prudence, and diligence commonly exercised by other attorneys. *Id.* at 645. In contrast, laymen are likely to lack the skill and experience to

recognize the negligence of their attorneys at the time it takes place. *Id.* The *Willis* court also emphasized the fiduciary duty owed to the client by the attorney, which requires the attorney to disclose all facts material to the representation of the client. *Id.* It would be inappropriate to allow the attorney to avoid a malpractice suit when the attorney had also breached the duty to disclose facts the attorney was required to disclose but instead concealed. *Id.* (quoting *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 98 Cal.Rptr. 837, 845, 491 P.2d 421, 429 (1971)).

In this case, Grady filed his lawsuit against the Akin Gump Defendants in September 1992. The Court has found that Grady did not discover the facts on which he bases this lawsuit until November 1991. The Court also found that he could not have discovered these facts, in the exercise of reasonable care and diligence, prior to November 1991. Although Grady is a sophisticated businessman, the transactions designed and executed by the Akin Gump Defendants were also complex and sophisticated. Akin Gump, and particularly Miller and Hatfield, were specifically engaged because of their expertise in designing and executing complicated reorganizations such as the Chama "reorganization." Grady relied on Miller, Hatfield, and Akin Gump. Although the transactions were completed prior to September 1990, the acts of negligence and gross negligence—the failure of the Akin Gump Defendants to disclose their underlying agenda to aid Kelso in the takeover of Chama—were not reasonably discoverable until November 1991.

### Legal Malpractice

■ A legal malpractice claim is based on negligence. *Cosgrove v. Grimes,* 774 S.W.2d 662, 664 (Tex.1989). The plaintiff must prove four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached the duty; (3) the breach proximately caused the plaintiff injury; and (4) damages resulted. *Id.* at 665.

■ *Attorney–Client Relationship.* The Akin Gump Defendants deny that they represented Grady and Chama, and thus deny that they owed a duty to them. The Court, however, concludes that there is suffi-

cient evidence in the record to determine that an attorney-client relationship was formed between the Akin Gump Defendants and Grady. The Court has found that Kelso was an agent of Grady's who had the authority to hire counsel for Grady and Chama to design and implement the Chama reorganization scheme; Kelso did hire counsel for Grady and Chama for this purpose. An agent may employ counsel for his principal. *See Randolph v. Resolution Trust Corp.,* 995 F.2d 611, 616 (5th Cir.1993) (recognizing this possibility in vacating a summary judgment and remanding the determination as to whether an attorney-client relationship existed), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994); *Polland & Cook v. Lehmann,* 832 S.W.2d 729, 738 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (finding that agent had authority to hire counsel for principal). An attorney-client relationship also may be based on an express or implied contract. *Simpson v. James,* 903 F.2d 372, 376 (5th Cir.1990). The relationship may be implied from the conduct of the parties. *Kotzur v. Kelly,* 791 S.W.2d 254, 257–58 (Tex.App.—Corpus Christi 1990, no writ). "All that is required is that the parties explicitly or by their conduct manifest an intention to create the attorney-client relationship." *Parker v. Carnahan,* 772 S.W.2d 151, 156 (Tex.App.—Texarkana 1989, writ denied) (citing *Nolan v. Foreman,* 665 F.2d 738 (5th Cir.1982)); *see Simpson,* 903 F.2d at 376 ("[T]he evidence was sufficient for a reasonable jury to conclude that an attorney-client relationship existed, as manifested through the parties' conduct."). The contract may result if the client makes an offer or request of the attorney and the attorney accepts or assents. *Simpson,* 903 F.2d at 376 (citing *State v. Lemon,* 603 S.W.2d 313, 318 (Tex. Civ.App.—Amarillo 1980, no writ)). In addition, an attorney may be held negligent when he fails to advise a party that he is not representing that party, when circumstances lead the party to believe that the attorney is representing him. *Randolph,* 995 F.2d at 615 (citing *Kotzur,* 791 S.W.2d at 257–58); *Carnahan,* 772 S.W.2d at 157.

Although the Texas Disciplinary Rules of Professional Conduct do not provide a stan-

dard for when an attorney-client relationship is formed, they provide guidance on the activities an attorney performs for a client. Tex. Disciplinary R.Prof. Conduct preamble ¶ 2 (1989), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. (Vernon Supp.1995) (State Bar Rules art. X, § 9); *Clarke v. Ruffino*, 819 S.W.2d 947, 949 (Tex.App.—Houston [14th Dist.] 1991, writ dism'd w.o.j.). An attorney evaluates the client's affairs and reports on them to the client or to others. *Id.* In addition, as an advisor, the attorney informs the client of his or her legal rights and obligations and explains their practical implications. Tex. Disciplinary R.Prof. Conduct preamble ¶ 2 (1989). The Akin Gump attorneys performed such functions. Miller developed the business plan, and Hatfield and Fernandez drafted the agreements necessary to implement the plan. During this time, these Akin Gump attorneys consulted directly with Grady. *See* Exhibits A & B. Such direct communications would have been a violation of the State Bar Rules if Grady was represented by other attorneys with respect to the matter discussed, and if Akin Gump and its lawyers represented Kelso/LEI. *See* Tex. Disciplinary R.Prof. Conduct 4.02 (1989) (prohibiting a lawyer from communicating about the subject of the representation with a person the lawyer knows to be represented by another lawyer regarding that subject). These communications along with other mentioned facts and circumstances manifest an attorney-client relationship. Although Grady had other attorneys, these attorneys were not engaged to handle these transactions and played only a minimal role in them.

The facts and circumstances indicate that an attorney-client relationship existed between Grady and the Akin Gump Defendants with regard to the Chama problems. Grady believed that the Akin Gump attorneys were hired on his behalf by his agent Kelso. His belief was a reasonable one, and the Akin Gump Defendants never did anything to counter this belief until late in 1991. At that point, the Akin Gump Defendants had conducted themselves as Grady's attorneys for almost two years.

■ As a result of the attorney-client relationship, the Akin Gump Defendants owed certain duties to Grady and Chama, which included the duty to use utmost good faith in dealings with them, the duty to maintain their confidences, and the duty to use reasonable care in rendering professional services to them. *Yaklin v. Glusing, Sharpe & Krueger*, 875 S.W.2d 380, 383 (Tex.App.—Corpus Christi 1994, no writ).

■ ***Negligence.*** An attorney is negligent if he or she fails to exercise the standard of care that would be exercised by a reasonably prudent attorney. *Cosgrove,* 774 S.W.2d at 664. If the decision was a reasonable decision at the time it was made, the attorney will not be held liable if the decision later proves to be imperfect. *Id.* at 665. The Court finds that the acts and omissions of the Akin Gump Defendants constitute negligence. Prior to their representation of Grady and Chama in the Chama "reorganization" matter, the Akin Gump Defendants did not disclose their prior representation of Kelso. Miller did not disclose his personal relationship with Kelso. They did not provide Grady with any indication that they were not acting in his best interest. Believing that they were acting in his best interest, and in the best interest of Chama, Grady approved of the leases and voting trusts that deprived him of control of the ranch for fifty years, an outrageous length of time. In addition, the Court finds that the failure of the Akin Gump Defendants to provide the resignation letter or an alternative mechanism by which Kelso could be removed as trustee of the voting trusts constitutes negligence. Finally, the Court finds that the amendment that substituted Miller as the successor trustee of the voting trusts was grossly negligent conduct.

■ ***Gross Negligence.*** The Court also finds that the Akin Gump Defendants were grossly negligent. Gross negligence is defined as

more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1995); *Resolution Trust Corporation v. Acton,* 49 F.3d 1086, 1090 (5th Cir.1995); *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 20 (Tex.1994). In *Moriel,* the Supreme Court noted that gross negligence consists of two components—(1) the defendant's act or omission, and (2) the defendant's mental state. 879 S.W.2d at 21. Specifically, the defendant's act or omission must create an extreme risk of harm, and the defendant's mental state must be one of *conscious* indifference. *Id.*

The first determination, whether or not an act or omission creates an extreme risk, is an objective one in which the factfinder is to consider both the magnitude and probability of the anticipated injury to the plaintiff. *Id.* at 22. "Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent." *Id.* (footnote omitted). The determinations require the examination of the facts and circumstances from the viewpoint of the defendant at the time of the event, without the benefit of hindsight. *Id.* at 23.

The second determination as to the mental state is a subjective one, the goal of which is to determine if the defendant was actually aware of the extreme risk created by his or her actions; the defendant must be actually, subjectively aware of the extreme risk and proceed with conscious indifference to the rights, safety, or welfare of others. *Id.* at 22. Gross negligence does not, however, require that the defendant acted purposefully or intentionally. *Acton,* 49 F.3d at 1091. Proof of the defendant's subjective mental state may be by circumstantial evidence. *Moriel,* 879 S.W.2d at 23.

The actions that the Court has found to be negligent also constitute gross negligence. The negligent acts created a risk of extreme harm: when an attorney does not act in the best interest of his client, the magnitude of the harm is great and the probability of harm very likely. In addition, as the Court noted in the findings of fact, the Akin Gump Defendants were actually aware of the risk their actions created for Grady and proceeded with conscious indifference to that risk.

***Breach of Fiduciary Duty.*** The Court also finds that the Akin Gump Defendants breached the fiduciary duty they owed to their client Grady. The attorney-client relationship is a highly fiduciary one. *Perez v. Kirk & Carrigan,* 822 S.W.2d 261, 265 (Tex.App.—Corpus Christi 1991, writ denied) (citing *Archer v. Griffith,* 390 S.W.2d 735, 739 (Tex.1964)); *see Central Savings & Loan Ass'n v. Stemmons Northwest Bank, N.A.,* 848 S.W.2d 232, 243 (Tex.App.—Dallas 1992, no writ); *Avila v. Havana Painting Co.,* 761 S.W.2d 398, 400 (Tex.App.—Houston [14th Dist.] 1988, writ denied) (relationship is a fiduciary one). Thus, the transactions between attorney and client are subject to the same scrutiny as transactions between a trustee and beneficiary. *Perez,* 822 S.W.2d at 265. The relationship requires "absolute and perfect candor, openness and honesty, and the absence of any concealment or deception." *Id.*

The Court has already found that an attorney-client relationship existed between Grady and Chama and the Akin Gump Defendants. The Akin Gump Defendants breached this duty by their acts.

***Causation and Damages.*** Proximate cause includes both elements of cause-in-fact and foreseeability in Texas. *Brown v. Edwards Transfer Co., Inc.,* 764 S.W.2d 220, 223 (Tex.1988). The Court must find that the acts of the Akin Gump Defendants were the cause-in-fact of Grady's injuries. Cause-in-fact requires the Court to find that the bad acts and omissions of the Akin Gump Defendants were a "substantial factor in producing the injury, and without such [acts and omissions] no harm would have resulted." *Id.* Foreseeability requires that the Akin Gump Defendants should have anticipated the danger of their actions to others. *Id.* "All that is required is that the injury be of such a general character as might reasonably have been anticipated and that the injured party be so situated with relation to the wrongful act that injury might reasonably have been foreseen." *Id.* at 224. The Court finds that the acts and omissions of the Akin Gump Defendants were the cause-in-fact of

Grady's injuries and that the damages to Grady were foreseeable.

The Court has found that the damages to Grady, which damages were actually and proximately caused by the breaches of duty by the Akin Gump Defendants, are one million dollars. In addition, the Court has found that Grady's cost of litigation for extracting himself from the situation created by Kelso and the Akin Gump Defendants is three million dollars. The Court apportioned responsibility among the Akin Gump Defendants as follows: Akin Gump, 25 percent; Miller, 25 percent; Hatfield, 25 percent; Miller, P.C., 12.5 percent; Hatfield, P.C., 12.5 percent. All the Akin Gump Defendants are jointly and severally liable for Grady's actual damages. Tex.Civ.Prac. & Rem.Code Ann. § 33.013 (Vernon Supp.1995).

■■■■ Exemplary damages are also available for a legal malpractice action. Tex. Civ.Prac. & Rem.Code Ann. § 41.002 (Vernon Supp.1995).[15] Section 41.003 of the Texas Civil Practice and Remedies Code provides that exemplary damages may be awarded only if the claimant proves that the injury results from fraud, malice, or gross negligence. The Court has found that the claimant has proven the elements of gross negligence.[16] Thus, an award of punitive damages is appropriate. In making an award of exemplary damages, the Court is to consider the nature of the wrong, the character of conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). The Court can also consider the size of award needed to deter similar wrongs in the future. *Transportation Insurance Co. v. Moriel*, 879 S.W.2d 10, 27 n. 22 (Tex.1994). The amount of exemplary damages awarded,

however, must be reasonably proportioned to actual damages. *Kraus*, 616 S.W.2d at 910. Moreover, the Texas legislature requires that exemplary damages do not exceed four times the amount of the actual damages or $200,-000, whichever is greater. Tex.Civ.Prac. & Rem.Code Ann. § 41.007 (Vernon Supp. 1995). With the foregoing standards in mind, exemplary damages are assessed as follows: Akin Gump, one million dollars; Miller, one million dollars; Hatfield, one million dollars; Miller, P.C., $500,000; Hatfield, P.C., $500,000. *See id.* at § 41.005.

## Civil Conspiracy

■■■■ A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose by unlawful means. *Ward v. Sinclair*, 804 S.W.2d 929, 931 (Tex.App.—Dallas 1990, writ denied) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Civil conspiracy requires (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or courses of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id.* The Court finds that the evidence in the record was insufficient to prove that a conspiracy existed between the Akin Gump Defendants and Kelso.

## Attorney's Fees, Prejudgment Interest, and Costs

■■■■ The Court will not make a separate award of attorney's fees; such award is subsumed within the above award of punitive damages. The Court may not assess prejudgment interest on an award of exemplary damages. Tex.Civ.Prac. & Rem.Code Ann. § 41.006 (Vernon Supp.1995). The Court will award prejudgment interest on its award of actual damages to Grady from September 1, 1992, until the judgment is collected. The Court will award all court costs to Grady.

---

15. The Court notes initially that the Texas legislature recently amended chapter 41, Exemplary Damages, of the Texas Civil Practice and Remedies Code. *See* Act of April 20, 1995, 74th Leg., R.S., ch. 19, 1995 Tex.Sess.Law Serv. 108 (Vernon). These amendments apply only to a cause of action that accrues on or after the effective date of the act, which is September 1, 1995. *Id.* Thus, the amendments do not apply in this case.

16. Gross negligence is defined in the Texas Civil Practice and Remedies Code. Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1995). This definition is the same definition as that used by this Court in determining that the Akin Gump Defendants were liable for gross negligence. *See* discussion *supra; see also Acton*, 49 F.3d at 1090; *Moriel*, 879 S.W.2d at 20.

## Preclusive Effect of Prior Findings

The Akin Gump Defendants urge this Court to find that testimony by Grady and findings entered by this Court in a related adversary proceeding preclude this Court from determining certain issues before the Court in this proceeding. In a related adversary, the Court found that

> Grady had a very urgent "just cause or excuse" for allowing the diminution of the Chama stock: he was faced with complete forfeiture of the Chama Ranch property to state and federal wildlife authorities. The dispersion of Chama's equity interests ultimately resulted in the preservation of the Chama Ranch assets from that threat of forfeiture.

*Legal Econometrics, Inc. v. Chama Land & Cattle Company, Inc. (In re Legal Econometrics, Inc.)*, 169 B.R. 876, 885 (Bankr. N.D.Tex.1994) [hereinafter Regency Trial]. In addition, the Akin Gump Defendants assert that Grady testified during the Regency Trial that he knew the Chama reorganization affected the value of Chama and that the purpose of the reorganization was to protect the assets of the Chama Ranch from the State of New Mexico. Because of this testimony and the Court's findings, the Akin Gump Defendants contend that Grady is judicially and collaterally estopped from asserting a different position in this case. Further, the Akin Gump Defendants argue that the doctrine of the law of the case prevents this Court from "redetermining" certain issues in this case.

The Court disagrees. As to these arguments of estoppel and law of the case, it is important to note certain facts. The Regency Trial was an attempt by Regency Savings Bank, F.S.B., as plaintiff, ("Regency") to get a judgment excepting its claim from discharge by Grady due to Grady's caused conveyance from Chama of fifty-year leases on the Ranch land, Game Parks, and other Chama assets to new corporations, plus voting trusts on stocks for fifty years.[17] These conveyances occurred while an entity affiliated with NCNB, Regency's predecessor-in-interest, managed the loan for NCNB Bank, and while NCNB was the holder of the note and lien executed by Grady. Regency claimed fraud on its predecessor and some right to that claim against Grady. The Court found that the manager of the loan (an entity known as Amresco) had knowledge of Grady's transactions, talked to a representative of the Game and Wildlife Commission of the State of New Mexico, and also had written reports of Grady's default. Grady was defending against this situation.

In this trial, Grady now sues the Akin Gump Defendants for their agenda in aiding Kelso to do a number on Grady. This set of facts is a different set of facts than those found by the Court as to the justification of Grady's actions. The points in this case as to the Akin Gump Defendants are whether the pervasive 1990 transactions were necessary and whether the Akin Gump Defendants violated their fiduciary duties to their client. The Court herein has concluded the 1990 transactions were excessive—it was not necessary to cut off Grady's head to save him. Also, the Court has concluded that the Akin Gump Defendants violated their fiduciary duties to Grady. With these facts in mind, the Court will address specifically the preclusion arguments of the Akin Gump Defendants.

 The Court acknowledges that the doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to the position that party previously took in a prior proceeding. *See United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993) (stating the doctrine and noting the doctrine is recognized in the Fifth Circuit), *cert. denied* —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). Typically, courts note that the purpose of the doctrine is to prevent a party from playing "fast and loose" with the courts to suit the party's own purposes. *Id.; Phillips v. Federal Deposit Insurance Corp. (In re Phillips)*, 124 B.R. 712, 720 (Bankr.W.D.Tex.1991). The doctrine applies to prevent the party from contradicting his or her own sworn statements made during prior litigation. *McCaskey*, 9 F.3d at 378; *Phillips*, 124 B.R. at 720. The Court finds, however, that Grady's position in

---

17. As part of a debt restructuring in 1988, Grady pledged to NCNB his Chama stock as collateral.

this case does not contradict his sworn statements in the Regency Trial. As noted above, in the Regency Trial, Grady testified that the purpose of the restructuring was to protect the Chama assets. In this proceeding, Grady does not deny that the purpose of the 1990 transactions was to protect the Chama assets. He is asserting that the corporate restructuring designed and implemented by the Akin Gump Defendants turned out to have been unnecessarily pervasive, and that the perceived threat of forfeiture of Chama's assets was exaggerated by Kelso. The Court finds that this position is not contrary to the position taken by Grady in the Regency Trial.

■■■■ Further, the Court finds that, to the extent that Grady's testimony is inconsistent with his position in this lawsuit, judicial estoppel is not appropriate in this case. Judicial estoppel should not be applied if the party's earlier position was taken as a result of mistake, inadvertence, or fraud. *See Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir.1973) (applying Texas law); 1B James Wm. Moore et al., *Moore's Federal Practice* ¶ 0.405[8] (2d ed. 1995) ("[A] prior position that can be explained as unadvised or the product of honest error, will not preclude a party from establishing the true state of the facts. . . ."). The reason for this is that the doctrine is designed to prevent "cold manipulation and not an unthinking or confused blunder." *Johnson Serv. Co.*, 485 F.2d at 175. The Court finds that, since Grady testified at the Regency Trial, he learned new information from officials from the State of New Mexico, John Paternoster and Chester Walter, that caused him to realize that Kelso had greatly exaggerated Chama's problems with the State. Grady's prior testimony was based on misleading information provided to him by Kelso. Although the attorney for the plaintiff Regency introduced deposition testimony of Paternoster at the Regency Trial, this introduction did not take place until after Grady testified. In addition, the testimony of Paternoster offered in the trial on this case on June 13, 1995, was much more extensive than the deposition testimony offered in the Regency Trial. For this additional reason, the Court finds that judicial estoppel should not

operate to preclude Grady from seeking the relief he seeks in this case.

■■■■ The Akin Gump Defendants also argue that the above-quoted findings of the Court and Grady's testimony collaterally estop Grady from relitigating the purpose behind the corporate reorganization and the dispersion of the Chama assets. (Akin Gump Defendants' Trial Brief on Preclusive Effect of Prior Findings of Fact & Grady Vaughn's Prior Testimony at 5). The doctrine of collateral estoppel prevents a party from relitigating issues of fact or law that are validly, necessarily, and actually determined as final and conclusive in a prior action. *United States v. Shanbaum*, 10 F.3d 305, 311 (5th Cir.1994); *Sidag Aktiengesellschaft v. Smoked Foods Products Co., Inc.*, 776 F.2d 1270, 1275 (5th Cir.1985). Collateral estoppel requires that (1) the issue under consideration in the subsequent action be identical to the issue litigated in the prior action; (2) the issue must have been fully and fairly litigated; (3) the issue must have been necessary to support the judgment in the prior case; and (4) no special circumstances would render preclusion inappropriate or unfair. *Shanbaum*, 10 F.3d at 311. The Court finds that collateral estoppel should not apply in this case for several reasons.

First and foremost, Grady is not relitigating the purpose behind the 1990 transactions and the dispersion of Chama's assets. This trial concerns whether the conduct of Grady's lawyers, the Akin Gump Defendants, constitutes negligence, gross negligence, and breach of fiduciary duty. The issues that were litigated in this trial were the acts and omissions of the Akin Gump Defendants, especially with regard to their underlying agenda to aid Kelso obtain control of Grady's assets.

Second, the Court notes that special circumstances in this case render preclusion inappropriate, unfair, and unjust. Grady's attorney in the Regency Trial was Robert Cook. Subsequent to the trial, at a hearing before this Court, Cook acknowledged that he owed a fiduciary duty both to Kelso and Grady because Kelso is his client and

friend.[18] The Court finds that, once again, Grady was not properly represented in the previous trial because of the ties between Cook and Kelso. For this reason and because Grady is not attempting to relitigate issues decided in the Regency Trial, collateral estoppel is not appropriate.

Third, the Court notes that the controlling facts have changed since the Regency Trial. As discussed above, since the Regency Trial, Grady and this Court have heard the additional and more extensive testimony of the New Mexico officials Paternoster and Walter. This testimony revealed to Grady that his prior testimony was based on misinformation supplied to him by Kelso. The Court has also had the benefit of this additional information. Collateral estoppel is not appropriate when the controlling facts leading to a conclusion have changed significantly. *See Montana v. United States,* 440 U.S. 147, 159, 99 S.Ct. 970, 976–77, 59 L.Ed.2d 210 (1979); *Niagara Frontier Tariff Bureau, Inc. v. United States,* 826 F.2d 1186, 1189–90 (2d Cir.1987) (noting that collateral estoppel should not be applied where the controlling facts have changed significantly). Although the controlling facts may not have changed in this case, the facts have become more fully revealed. For this additional reason, collateral estoppel would be inappropriate.

Finally, the Court's decision in the Regency Trial was based on alternative determinations. If a ruling is based on multiple or alternative findings, the findings do not have preclusive effect; the finding must have been necessary. *Hardy v. Johns-Manville Sales Corp.,* 681 F.2d 334, 341 (5th Cir.1982); *Halpern v. Schwartz,* 426 F.2d 102, 105 (2d Cir.1970). In the Regency Trial, one of the causes of action the plaintiff Regency was trying to prove was that its claim should not be discharged pursuant to 11 U.S.C. § 523(a)(6). In the Regency Trial, this Court noted that a § 523(a)(6) action requires a wrongful act that is intentionally done and that necessarily causes harm and is without just cause or excuse. *Legal Econometrics, Inc.,* 169 B.R. at 885. The Court found that Regency did not prove that the 1990 transactions caused Regency harm.[19] *See id.* (finding that Regency did not show that diminution of the Chama stock occurred and that, if diminution did occur, it necessarily caused harm to Regency). The Court also found that the defendants had shown that Grady's acts were with just cause or excuse. *Id.* Either finding is sufficient to deny Regency's request for a § 523(a)(6) exception to discharge. Thus, collateral estoppel is not appropriate.

The Court also finds that the doctrine of "law of the case" does not preclude the Court's findings in this case. The doctrine of law of the case is merely a rule of practice based on the policy that once an issue is litigated and decided it should not be relitigated. *Loumar, Inc. v. Smith,* 698 F.2d 759, 762 (5th Cir.1983); *In re MCorp Financial, Inc.,* 139 B.R. 820, 823 (S.D.Tex.1992); *In re Peters,* 91 B.R. 401, 412 (Bankr. W.D.Tex.1988). The doctrine is not an inexorable command, however, and is not to be applied when it would work injustice. *Loumar, Inc.,* 698 F.2d at 762; *MCorp Financial, Inc.,* 139 B.R. at 823. For the reasons previously discussed with regard to judicial and collateral estoppel, the Court finds that the doctrine should not be applied as to the above-quoted findings from the Regency Trial.

### Miscellaneous

The Akin Gump Defendants have raised additionally the following defenses: (a) the knowledge of attorney Falconer was imputed to Grady; (b) laches as bar to Grady's causes of action; (c) Grady's failure to mitigate damages; (d) Grady's ratification of the acts of the Akin Gump Defendants; and (e) Grady's owns acts of fraud or inequitable conduct as preclusion to his recovery. The Court finds that there is no evidence to support any of

---

18. Cook testified, "I have no conflict between [Kelso] and Grady Vaughn, or at least I may have a major conflict and always have, because I feel I've owed a fiduciary duty to both of them." Transcript of August 10, 1994 Hearing on Confirmation of Chapter 11 Plan et al., *In re Legal Econometrics, Inc.,* No. 393–35603–HCA–11 (Bankr.N.D.Tex. September 21, 1994).

19. Regency acquired the loan after all the events of conveyance occurred.

these positions. As to (a), Falconer was excluded from most of the discussions and practically all of the document preparation in the later stages of the relationship between Grady and the Akin Gump Defendants. As to (b), Grady took steps to rectify the situation shortly after he ascertained the facts. As to (c), Grady could not mitigate damages when he was locked into a fifty-year voting trust and the new corporations with fifty-year leases. As to (d), Grady did not, by any overt act, ratify the negligent acts and omissions of the Akin Gump Defendants. As to (e), the claim that Grady committed fraud or acted inequitably is totally unsubstantiated. In addition, the Akin Gump Defendants argue that Grady cannot recover future loss of earning capacity from personal services because such earnings are not part of his bankruptcy estate. The Court finds, however, that this argument is groundless, and was not even presented at trial.

 Grady seeks indemnification or contribution from the Akin Gump Defendants as to Gary's claims against Grady. This relief is to be denied. A right of indemnification arises when a person has become subject to tort liability for the unauthorized and wrongful conduct of another. *Humana Hospital Corp. v. American Medical Systems, Inc.*, 785 S.W.2d 144, 145 (Tex.1990).

All other relief requested is denied. All conclusions of law that could be construed as findings of fact should be so construed and vice versa. Judgment will be rendered consistent with these findings of fact and conclusions of law.

### JUDGMENT

Pursuant to the Findings of Fact and Conclusions of Law signed by the Court on November 1, 1995, the Court awards judgment in favor of Third Party Plaintiff Grady H. Vaughn, III, and against the Third Party Defendants—Akin, Gump, Hauer & Feld, f/k/a Akin, Gump, Strauss, Hauer & Feld, a Texas General Partnership, and its successor Akin, Gump, Hauer & Feld, L.L.P. ("Akin Gump"); J. Stephen Hatfield ("Hatfield"); Allen P. Miller ("Miller"); J. Stephen Hatfield, P.C. ("Hatfield, P.C."); and Allen P. Miller, P.C. ("Miller, P.C.")—as follows:

(a) actual damages of four million dollars, jointly and severally against all Third Party Defendants; and

(b) exemplary damages of four million dollars, which is specifically assessed against the Third Party Defendants as follows: one million dollars against Akin Gump; one million dollars against Hatfield; one million dollars against Miller; $500,000 against Hatfield, P.C.; and $500,000 against Miller, P.C.

The Court awards prejudgment interest as to the actual damage award from September 1, 1992, at the rate of five percent (5%) per annum, to the date the judgment is collected. The Third Party Defendants to pay all costs.

## AKIN, GUMP, STRAUSS, HAUER & FELD
### ATTORNEYS AT LAW

1333 NEW HAMPSHIRE AVENUE, N W
SUITE 400
WASHINGTON DC 20036
(202) 887-4000

65 AVENUE LOUISE, PB NO 7
1050 BRUSSELS, BELGIUM
(011) 32-2 535 29 11

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
4100 FIRST CITY CENTER
1700 PACIFIC AVENUE
DALLAS, TEXAS 75201-4618
(214) 969-2800
TELEX 73-2324 CABLE AGSH &F DALLAS
FAX (214) 922-8043

WRITER'S DIRECT DIAL NUMBER (214) 969-4690

2100 ONE CONGRESS PLAZA
111 CONGRESS AVENUE
AUSTIN, TEXAS 78701
(512) 499-6200

1500 NCNB PLAZA
300 CONVENT STREET
SAN ANTONIO, TEXAS 78205
(512) 270-0800

1900 PENNZOIL PLACE-SOUTH TOWER
711 LOUISIANA STREET
HOUSTON, TEXAS 77002
(713) 220-5800

February 6, 1990

VIA HAND DELIVERY

Mr. Grady H. Vaughn, III
The Grayrock Corporation
2121 San Jacinto Street
Suite 3000, LB 85
Dallas, Texas 75201

RE: The Antigone Corporation/Voting Trust Corporation

Dear Mr. Vaughn:

At the request of Malcolm M. Kelso, please find a Voting
Trust Agreement (the "Voting Trust Agreement"), by and among The
Antigone Corporation (the "Company"), Grady H. Vaughn, III, Grady
Hamilton Vaughn, GVW, Ltd., Gary William Vaughn Support Trust,
Grady H. Vaughn III Children's Trust No. 2 and Grant Ellis Vaughn
Trust No. 2.

Upon execution of the Voting Trust Agreement, each
shareholder shall endorse over to the Trustee all stock
certificates issued to such shareholder by the Company. The
Trustee will then deliver these certificates to the Company for
reissuance in the name of the Trustee. Upon receipt of these
certificates, the Company must cancel these certificates on the
books of the Company and issue new certificates representing such
shares in the name of "Grady H. Vaughn, III as Voting Trustee
under the Voting Trust Agreement dated February __, 1990."

Each shareholder shall receive an executed Voting Trust
Certificate for Capital Stock (the "Voting Trust Certificate"), a
copy of which is attached as Exhibit A to the Voting Trust
Agreement. This Voting Trust Certificate will represent that
shareholder's beneficial ownership in the Company. The Voting

EXHIBIT
A

AKIN, GUMP, STRAUSS, HAUER & FELD
 Mr. Grady H. Vaughn, III
 February 6, 1990
 Page 2

 Trust Certificates can be prepared by photocopying the form of Exhibit A attached to the Voting Trust Agreement and filling in the blanks as appropriate.

 If you have questions regarding this procedure, please do not hesitate to call me at the above number or Steve Hatfield at (214) 969-2837.

 Sincerely,

 Kenneth C. Fernandez

KCF/pd
Enclosure

cc: Malcolm M. Kelso (w/enc.)
 J. Stephen Hatfield, P.C. (w/enc.)

### AKIN, GUMP, STRAUSS, HAUER & FELD
ATTORNEYS AT LAW
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

333 NEW HAMPSHIRE AVENUE, N W
SUITE 400
WASHINGTON D C 20036
(202) 887-4000

65 AVENUE LOUISE, P B NO 7
1050 BRUSSELS BELGIUM
(011) 32-2-535 29 11

4100 FIRST CITY CENTER
1700 PACIFIC AVENUE
DALLAS, TEXAS 75201-4618
(214) 969-2800
TELEX 73-2324 CABLE AGSH &F DALLAS
FAX (214) 922-8043

2100 ONE CONGRESS PLAZA
111 CONGRESS AVENUE
AUSTIN, TEXAS 78701
(512) 499-6200

1500 NCNB PLAZA
300 CONVENT STREET
SAN ANTONIO, TEXAS 78205
(512) 270-0800

1900 PENNZOIL PLACE-SOUTH TOWE
711 LOUISIANA STREET
HOUSTON, TEXAS 77002
(713) 220-5800

WRITER'S DIRECT DIAL NUMBER (214) 969- 4690

January 10, 1990

VIA HAND DELIVERY

Mr. Grady H. Vaughn, III
The Grayrock Corporation
2121 San Jacinto Street
Suite 3000
Dallas, Texas 75201

 Re: The American Elk Conservatory, Inc., A Nonprofit
 Corporation (the "Company")

Dear Mr. Vaughn:

 At the request of Steve Hatfield, enclosed please find drafts
of the following documents for your review and comment:

 1. Reorganization chart for Chama Land & Cattle
 Company ("Chama");

 2. Articles of Incorporation of the Company;

 3. Bylaws of the Company;

 4. Unanimous Consent in Lieu of Organizational Meeting
 of the Sole Member of the Board of Directors of the
 Company;

 5. Subscription Agreement whereby the Grady Vaughn
 Trust agrees to purchase 688 shares of the common
 stock of the Company;

 6. Subscription Agreement whereby the Gary Vaughn
 Trust agrees to purchase 312 shares of the common
 stock of the Company;

 7. Lease and Operating Agreement to be entered into by
 and between Chama and the Company; and

EXHIBIT
B

AKIN GUMP, STRAUSS, HAUER & FELD

8. Promissory Note and Security Agreement by the
Company in favor of Chama.

In addition, we are currently drafting a warrant and a
Unanimous Consent of the Sole Member of the Board of Directors of
the Company authorizing the above documents and those documents
will be sent to you upon completion. Please call either myself at
the above number or Steve Hatfield at 969-2837 with your comments.

Sincerely,

Kenneth C. Fernandez

KCF/ped
Encs.

cc: Malcolm M. Kelso (with enclosures)
 J. Stephen Hatfield, P.C. (with enclosures)